IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | | |
|---|---|---|
| | : | |
| MINISTER LOUIS FARRAKHAN and | : | |
| THE NATION OF ISLAM, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 1:23-cv-09110 |
| | : | JURY DEMANDED |
| | : | |
| ANTI-DEFAMATION LEAGUE, | : | |
| JONATHAN GREENBLATT, individually, | : | |
| and in his official capacity as CEO and National | : | |
| Director of the ANTI-DEFAMATION LEAGUE, | : | |
| SIMON WIESENTHAL CENTER, and RABBI | : | |
| ABRAHAM COOPER, individually and in his | : | |
| official capacity as Director of Global Social Action | : | |
| Agenda for the SIMON WIESENTHAL CENTER, | : | |
| | : | |
| Defendants. | : | |

_____  :


FIRST AMENDED COMPLAINT
FOR VIOLATION OF CONSTITUTIONALLY PROTECTED RIGHTS, DEFAMATION,
AND DECLARATORY RELIEF

Table of Contents

Introduction ........................................................................................................................... 1

Jurisdiction ........................................................................................................................... 2

Venue .................................................................................................................................... 3

Parties ................................................................................................................................... 3

  Plaintiffs ............................................................................................................................ 3

  Defendants ......................................................................................................................... 3

Background ........................................................................................................................... 4

  Origin of the False Charge of Antisemitism Against Minister Farrakhan ................................. 9

  Minister Farrakhan's Numerous Efforts to Dialogue with His False Accusers ....................... 14

  Anti-Defamation League (ADL) ......................................................................................... 16

  Simon Wiesenthal Center (SWC) ....................................................................................... 29

  Minister Farrakhan's Respect for Judaism and Jewish People ............................................. 32

Facts ................................................................................................................................... 39

  ADL / Jonathan Greenblatt ................................................................................................ 39

  SWC / Rabbi Abraham Cooper .......................................................................................... 45

Counts ................................................................................................................................. 46

  Count 1 ............................................................................................................................ 46

    First Amendment – Freedom of Association - Under Color of Federal Law ..................... 46

      Farrakhan v. ADL ...................................................................................................... 46

  Count 2 ............................................................................................................................ 49

    First Amendment – Free Exercise of Religion - Under Color of Federal Law .................. 49

      Farrakhan v. ADL ...................................................................................................... 49

  Count 3 ............................................................................................................................ 54

    First Amendment – Free Exercise of Religion – Under Color of Federal Law ................. 54

      Nation of Islam v. ADL .............................................................................................. 54

  Count 4 ............................................................................................................................ 55

    First Amendment – Free Exercise of Religion - §1983 .................................................. 55

      Nation of Islam v. ADL .............................................................................................. 55

  Count 5 ............................................................................................................................ 65

    First Amendment – Freedom of Association - §1983 ..................................................... 65

      Nation of Islam v. ADL .............................................................................................. 65

Count 6 ............................................................................................................................ 67

   Defamation *Per se* (Trade/Business/Mission/Calling)........................................................ 67

     Farrakhan v.  ADL ........................................................................................................ 67

Count 7 ............................................................................................................................ 70

   Defamation *Per se* (Trade/Business/Mission/Calling)........................................................ 70

     Farrakhan v. Greenblatt ................................................................................................ 70

Count 8 ............................................................................................................................ 72

   Defamation *Per se* (Trade/Business/Mission/Calling)........................................................ 72

     Farrakhan v. SWC ....................................................................................................... 72

Count 9 ............................................................................................................................ 73

   Defamation *Per se* (Trade/Business/Mission/Calling)........................................................ 73

     Farrakhan v. Cooper .................................................................................................... 73

Count 10 .......................................................................................................................... 75

   De Facto Defamation *Per Se* .......................................................................................... 75

     Farrakhan v. All Defendants ........................................................................................ 75

Count 11 .......................................................................................................................... 79

   Declaratory Judgment ...................................................................................................... 79

     The ADL is a Quasi-governmental Entity....................................................................... 79

       Justification #1 – Close Nexus and Symbiotic Relationship with the F.B.I. ............... 79

       Justification #2 – Information Sharing Between it and the F.B.I................................. 80

       Justification #3 – "Entwinement" with the Federal Government ................................. 81

       Justification #4 – Drafting, Shaping, and Implementing a National Policy ................. 82

       Justification #5 – Solicited Funds Directly from the OMB ........................................ 84

Request for Relief ............................................................................................................. 87

# INTRODUCTION

1. This action is brought by the National Representative of the Most Honorable Elijah Muhammad, the Honorable Minister Louis Farrakhan (hereinafter, "Minister Farrakhan"), and Muhammad's Holy Temple of Islam, Inc. (hereinafter, "Nation of Islam") to ensure that he, and those who believe and follow him, and others, do not continue to be deprived of rights secured to them by the United States Constitution.

2. For nearly forty (40) years, the Anti-Defamation League (hereinafter, "ADL"), later joined by the Simon Wiesenthal Center (hereinafter, "SWC"), in violation of the rights and protections guaranteed by the First Amendment to the United States Constitution, have engaged in actions to hinder Minister Farrakhan and the Nation of Islam from continuing the Mission that Allah (God) gave to the Most Honorable Elijah Muhammad.

3. That Mission, accepted by Minister Farrakhan, is to deliver the Truth that will correct the condition of spiritual, mental, and moral death of the Black man and woman of America that came as a result of 310 years of chattel slavery and more than 150 years of oppression and suppression, thereafter.

4. While the Most Honorable Elijah Muhammad's Mission started with the Black man and woman of America, that Mission has expanded through Minister Farrakhan to the whole of humanity.

5. The rights and protections guaranteed by the United States Constitution must be applied equally to all, regardless to race, creed, class, color, or religion.

6. This lawsuit is to ensure that the abuse, misuse, and false use of the terms "anti-Semite," "anti-Semitic," and "antisemitism," as falsely charged by the Defendants, is permanently barred from being a tool to defame Plaintiffs and infringe upon their constitutional rights.

1

7. The actions by the Defendants to hinder Minister Farrakhan from carrying out his assignment and Mission are not just violative of his and the Nation of Islam's rights, but said hinderance is not good for America or for the American people's right to know the truth, so that they can have the opportunity to avoid the Judgment of Allah (God) that is imminent.

8. The First Amendment to the U.S. Constitution guarantees certain freedoms, including free exercise of religion, freedom of speech, freedom of association, freedom of assembly, and freedom of expression.

9. These First Amendment freedoms form the core of the rights guaranteed to the people by the Constitution of the United States.

10. The precipitous increase in recent times of damages caused by the Defendants' violation of Minister Farrakhan and the Nation of Islam's constitutional rights and their repeated malicious defamation warrants this action.

11. Minister Farrakhan and the Nation of Islam seek to find Defendants jointly and severally liable in the amount of $4.8 billion, and also seek declaratory relief, attorneys' fees and costs, and any other relief warranted as a result of Defendants' actions.

## **JURISDICTION**

12. This Court has subject matter jurisdiction pursuant to: 1) 28 U.S.C. §1331 because this action presents a federal question for violation of rights under the First Amendment of the United States Constitution, 2) 42 U.S.C. §1983 because Defendants acted under color of state law when they violated Plaintiffs' rights, 3) 28 U.S.C. §1332 because this action involves parties of different states and the amount in controversy is $4.8 billion, 4) 28 U.S.C. §2202 because declaratory relief is sought, and 5) supplemental jurisdiction pursuant to 28 U.S.C. §1367 over the state law claims.

## VENUE

13. Venue is proper in the Southern District of New York pursuant to 28 U.S.C §1391(b)(2) and (b)(3) because a substantial part of the events arose in this district and because multiple Defendants are domiciled in this district.

## PARTIES

**PLAINTIFFS**

**The Honorable Minister Louis Farrakhan**

14. Minister Farrakhan is an individual who is currently domiciled in Chicago, Illinois, and is the National Representative of the Most Honorable Elijah Muhammad.

**The Nation of Islam**

15. The Nation of Islam, for corporate and legal purposes, is registered as Muhammad's Holy Temple of Islam, Inc., under the not-for-profit corporation laws of the State of Illinois, is headquartered in Chicago, Illinois, and is comprised of registered members who have acknowledged and accepted the Teachings of the Most Honorable Elijah Muhammad, under the Divine guidance of Minister Farrakhan.

**DEFENDANTS**

**Anti-Defamation League**

16. Defendant ADL is a nonprofit corporation organized under the laws of the District of Columbia, and its principal place of business is 605 3rd Avenue, New York, New York, 10158.

**Jonathan Greenblatt**

17. Defendant Jonathan Greenblatt (hereinafter, "Defendant Greenblatt") is the National Director and CEO of Defendant ADL and, upon information and belief, is domiciled in New York, New York.

**Simon Wiesenthal Center**

18. Defendant SWC is a nonprofit organization, organized under the laws of the State of California, and its principal place of business is 1399 South Roxbury Drive, Los Angeles, California, 90035, and it has a regional office at 11 Broadway, Suite 766, New York, New York, 10004.

**Rabbi Abraham Cooper**

19. Defendant Rabbi Abraham Cooper (hereinafter, "Defendant Cooper") is the Associate Dean and Director of Global Social Action Agenda for the SWC and, upon information and belief, is domiciled in Los Angeles, California.

## BACKGROUND

**The Founding of the Nation of Islam**

20. To understand the context of this case, and to have a better appreciation for Minister Louis Farrakhan and the gravity of his Mission, requires an understanding of the founding of the Nation of Islam and some of the foundational tenets of belief.

21. One of the foundational beliefs of the Nation of Islam is that the long predicted and awaited Saviour, Allah (God) in the Person of Master Fard Muhammad, came in fulfillment of Genesis 15:13-14 and Exodus 3:7-8 to liberate His people.

4

22. He appeared in America among Black people in Detroit, Michigan, on July 4, 1930, as America was celebrating the anniversary of its establishment as a nation.

23. Master Fard Muhammad gave a body of knowledge that was designed by Him to correct the near four hundred (400) years of mistreatment and misteaching, emanating from the doctrine of white supremacy, that has ill-affected Black people to the point that their condition is styled in the scriptures as being spiritually "dead."

24. On September 22, 1931, while in Detroit, Michigan, the Most Honorable Elijah Muhammad attended a religious meeting and met Master Fard Muhammad for the first time.

25. In October of 1931, Master Fard Muhammad began teaching the Most Honorable Elijah Muhammad day and night for three years and four months, and at the end of that process, Master Fard Muhammad anointed His Chief Student as the "Messenger of Allah (God)."

26. The Most Honorable Elijah Muhammad, as a Divinely missioned Teacher, stood up to deliver and establish that truth which would give justice to the Black man and woman of America, and give warning to the wicked in America that they should change course from their wickedness, or suffer the consequences of Allah (God)'s wrath and Judgment on America.

27. Master Fard Muhammad taught the Most Honorable Elijah Muhammad that truth of which Jesus prophesied, when he said, "you shall know the truth, and the truth shall make you free." (John 8:32)

28. A part of that body of knowledge taught by Master Fard Muhammad to the Most Honorable Elijah Muhammad is that 75% of the scriptures of the Bible were prophetic (referring to the future, which is now) and that 25% of the scriptures were historical.

5

29. The result of applying the Teachings of the Most Honorable Elijah Muhammad is the transformation of the lives of the people who were destroyed due to slavery, and the denial of freedom, justice, and equality.

30. In February of 1935, after teaching the Most Honorable Elijah Muhammad face-to-face for three years and four months, Master Fard Muhammad departed.

31. After He departed, the Most Honorable Elijah Muhammad continued the Mission given to Him by His Teacher.

32. During the first 44 years of His Mission, the Most Honorable Elijah Muhammad, and His followers, were hindered by the U.S. Government, through the Federal Bureau of Investigation (hereinafter, "F.B.I.") and Defendant ADL. For instance:

   a. In 1934, in Detroit, Michigan, the Most Honorable Elijah Muhammad presented Himself for arrest in support of His followers who were arrested and falsely charged by the Michigan State Board of Education with contributing to the delinquency of minors for setting up a school to teach the children of His people.[1]  The false charges were eventually dropped, and He, and the teachers, were freed;[2]

   b. The Most Honorable Elijah Muhammad was arrested by federal authorities on May 8, 1942, in Washington D.C., and questioned for hours on His Teachings, and on the false charge of not registering for the draft;[3]

   c. He was subsequently re-arrested on September 20, 1942, charged with sedition, and sent to Federal Prison in Milan, Michigan, until 1946. He said, He was sent to prison "for nothing other than to be kept out of the public and from teaching My people

---

[1] Elijah Muhammad, *Message To The Blackman in America,* "What Is Un-American?" p. 179.
[2] *Id*.
[3] *Id*.

the truth during the war between America, Germany and Japan."[4] Eighty-two (82) of His followers were also arrested with Him. Unknown at that time was the complicit and surreptitious role of Defendant ADL in these arrests through illegal surveillance of the Most Honorable Elijah Muhammad and His followers.

    d.   At the time of the arrest of the Most Honorable Elijah Muhammad in 1942, the F.B.I. also confiscated several documents containing His Teachings and doctrines, including: 1) a Blackboard containing a drawing of the Wheel (Mother Plane) spoken of in the Book of Ezekiel,[5] 2) His Teachings on the Wheel and its purpose, and 3) a body of knowledge that He taught to make His people whole again.

33.   The goal of the leadership of F.B.I. Director J. Edgar Hoover is best articulated in the following two F.B.I. memorandums: 1) on August 25, 1967, Director Hoover wrote: "[t]he purpose of this new counterintelligence endeavor is to expose, disrupt, misdirect, discredit, or otherwise neutralize the activities of Black nationalist, hate-type organizations and groupings, their leadership, spokesmen, membership, and supporters….", (Exhibit A) and, 2) on March 4, 1968, he wrote, the F.B.I. should do all it could to "[p]revent the rise of a 'messiah' who could unify and electrify, the militant Black nationalist movement." (Exhibit A-1)

34.   The Most Honorable Elijah Muhammad, throughout the first 44 years of His Mission, was falsely labeled as a "hate teacher," and His followers in the Nation of Islam were derogatorily described as a "cult."

35.   On February 26, 1954, during His Saviour's Day address, the Most Honorable Elijah Muhammad publicly prayed to Allah (God) to send Him "a little helper."

---

[4] *Id* at p. 221
[5] Ezekiel 1:15-21.

36. On February 26, 1955, during Saviour's Day, Allah (God) answered His prayer and sent Minister Farrakhan to Him, and he subsequently joined the Nation on October 5, 1955.

37. Minister Farrakhan began helping the Most Honorable Elijah Muhammad with His Mission and eventually became His National Representative in 1967.

38. The Most Honorable Elijah Muhammad departed on February 25, 1975, in fulfillment of another aspect of His Mission, although His enemies believed they had killed Him; but as the Holy Quran reveals, "…and they did not kill him for certain." (Holy Qur'an 4:157)

39. Before the Most Honorable Elijah Muhammad departed, He commissioned and anointed His Chief Helper and Best Student, Minister Farrakhan, to continue His Mission and make His Great Commission known.

40. Upon His departure, however, on February 25, 1975, new leadership arose that changed the belief system and the direction of the Nation of Islam, and they disregarded the public command He gave to the members of the Nation of Islam on July 30, 1972, when He said for them to hear, obey, and follow Minister Farrakhan.

41. When the new leadership, however, went in a different direction and took a different course of action, the Nation of Islam fell from the lofty heights the Most Honorable Elijah Muhammad had taken it to, and it became completely destroyed.

42. In September of 1977, Minister Farrakhan, decided to reestablish the Teachings of the Most Honorable Elijah Muhammad and to rebuild the Nation of Islam.

43. On February 21, 1981, at the Auditorium Theatre in Chicago, Illinois, Minister Farrakhan publicly declared that the Most Honorable Elijah Muhammad is still physically alive.

44. Not long thereafter, Minister Farrakhan found himself embroiled in a controversy with some members of the Jewish community who began calling him "anti-Semitic."

8

**ORIGIN OF THE FALSE CHARGE OF ANTISEMITISM AGAINST MINISTER FARRAKHAN**

45. On August 27, 1983, Minister Farrakhan spoke at the 20th Anniversary of the 1963 March on Washington.

46. Although he spoke for only six minutes, organizers and participants praised his message as perhaps the most significant and stirring message of the day.

47. The September 3, 1983, headline in *The Washington Post* read, "Speech by Black Muslim Leader Hailed as Best at March on Washington."

48. It was at this event that the Reverend Jesse Jackson (hereinafter, "Reverend Jackson") informed Minister Farrakhan that he would be seeking the 1984 presidential nomination, and he asked Minister Farrakhan for his support.

49. Minister Farrakhan indicated he would give Reverend Jackson an answer after he consulted with the board of the Nation of Islam.

50. Minister Farrakhan returned to Chicago, met with the board, and it was agreed that he, and the membership of the Nation of Islam, would support the 1984 presidential candidacy of Reverend Jackson.

51. During his presidential campaign, Reverend Jackson, among other things, advocated for a fair and balanced foreign policy regarding the State of Israel and the Palestinian people.

52. That justified and reasonable call for equity and fairness in the treatment of the Palestinian people's suffering unleashed a torrent of outrage by Defendant ADL against Reverend Jackson.

53. A group calling themselves "Jews Against Jackson" published an attack ad against Reverend Jackson, in *The New York Times,* on November 11, 1983, under the headline, "Do you believe that any Jew should support this man? Should any decent American?" (Exhibit B)

9

54. After stating, "[w]e believe that Jesse Jackson is a danger to American Jews, to the State of Israel, and to America," the attack ad ended by stating, "Jesse Jackson is no good for Jews, for Israel or for America. Stop him. Ruin Jesse now!" *Id.*

55. Immediately after that ad ran, hundreds of threats against the life of Reverend Jackson and his family were recorded and several arrests were made. (Exhibit C)

56. In addition, the remains of mutilated animals were left at his home and his campaign headquarters in two cities were bombed. (Exhibit D)

57. Reverend Jackson did not have Secret Service protection at the time; so, Minister Farrakhan provided Reverend Jackson and his family with around-the-clock security from the Fruit of Islam, the name given to the training of men who belong to Islam in North America under the Teachings of the Most Honorable Elijah Muhammad.

58. Soon thereafter, Minister Farrakhan became the focal point of Defendant ADL's diatribes and verbal attacks.

59. Minister Farrakhan never called for the extermination of Jews, and never physically or verbally attacked any Jewish person, but he sparked the ire of Defendant ADL because he dared to defend Reverend Jackson and his family whose safety and well-being were being threatened by, upon information or belief, members of Defendant ADL.  (Exhibit C)

60. On February 25, 1984, Minister Farrakhan held a rally in support of Reverend Jackson where he made an appeal to the group called "JEWS AGAINST JACKSON" to stop the violence and threats against Reverend Jackson's life and asked for dialogue.

61. During that rally, Minister Farrakhan said, in pertinent part:

> I'm saying to the Jewish people who may not like our brother, it is not Jesse Jackson that you are attacking... When you attack him, you attack the millions that are lining up with him. You're attacking all of us... We cannot define our self interest in terms of your self-interest.

> And because our self-interests differ because we've come of age, why dislike us? Why attack our champion? Why hurl stones at him?... I say to you as intelligent people, sit down and talk with Reverend Jackson. Sit down Jewish leaders and talk with us. We are ready to talk with you. Sit down and talk like intelligent people who have a future at stake…. (Exhibit E)

62. Two days later, on or about February 27, 1984, after Minister Farrakhan's sincere request for dialogue with Jewish leaders, the temperature of the torrents ratcheted up against him when Nathan Perlmutter, the then-National Director of Defendant ADL, called Minister Farrakhan a "Black Hitler," irrespective of the fact that Minister Farrakhan has never harmed a hair on the head of any Jewish person or even advocated for such.

63. Also, on that same day, Nat Hentoff, a Jewish columnist for *The Village Voice*, repeating Defendant ADL's sentiment, called Minister Farrakhan a "Black Hitler."

64. From that moment forward, the battle of Biblical proportions was on and raging between the antagonist, Defendant ADL, and the protagonist, Minister Farrakhan.

65. It is because of Minister Farrakhan's unwavering defense of himself and Reverend Jackson that Defendant ADL began plastering him with the false and injurious label of "anti-Semite."

66. On or about June 25, 1984, Minister Farrakhan delivered a message from *The Final Call* Administration Building, in Chicago, Illinois, addressing, in part, the creation of the State of Israel, and its existing turmoil in the Middle East, wherein he said:

> "Now, that nation called Israel never has had any peace in forty years and she will never have any peace because there can be no peace structured on injustice, thievery, lying, and deceit, and using the name of God to shield your dirty religion under His holy and righteous name."

> "America, and England, and the nations, because of their backing of Israel are being drawn into the heat of the Third World War, which is called "Armageddon." Oh America, you have blundered so, and instead of recognizing the mistake you have made and make a turn for the better, you persist in your evil. And so, the consequences of evil must come."

67.  The reference to "dirty religion" had absolutely nothing to do with the religion of Judaism, which Minister Farrakhan has stated on countless occasions, but had everything to do with sacrilegious people who use the good name of either Islam, Christianity, or Judaism as a shield for their dirty practices that do not comport with the Divine laws found in the sacred scriptures of the Holy Qur'an, the New Testament, or the Torah.

68.  At no point during that lecture did Minister Farrakhan ever say, "Judaism is a gutter religion" or "Judaism is a dirty religion."

69.  Thereafter, however, Defendant ADL, and their cohorts, added the word "Judaism" and "gutter" in front of the word "religion" to foster their false and deplorable narrative that Minister Farrakhan made such a statement.

70.  Defendant ADL has continued to falsely, and maliciously, accuse Minister Farrakhan of making that statement.

71.  On or about June 29, 1984, to address the false claim that he said, "Judaism is a gutter religion," Minister Farrakhan gave a television interview on *The Sandy Freeman Show*, wherein he said, in response to that false charge:

> "I could never make a statement like that and be a Muslim. All Muslims believe in God, believe in Moses, believe in the Torah, believe in the Injil (New Testament) brought by Jesus, and believe in the Qur'an brought by Muhammad. How could I, in good, sound mind, condemn Judaism?  But what I'm condemning is wicked practices using religion as a cover. The same thing was done with Christianity and the same thing is done by some Muslims."

72.  During that same interview, Ms. Freeman read a Senate Resolution that passed with a vote of 95-0, that occurred during her show, condemning Minister Farrakhan based on the false allegations regarding him saying Judaism was a "gutter religion," and that the creation of Israel was an outlaw act, to which he responded:

"I don't care two cents for the United States Senate's repudiation. I warn the Senate, and I warn the government, and I warn the president that America is headed down the drain.  You better listen to this little Black slave coming up from among you. My voice is the voice of God in your midst, and you are doing to me just what you did to all the prophets, and those prophetic voices that rose up before me."

You condemned Jesus, and the Roman Senate, repudiated him.  But today, you worship Him.  What will you do for me tomorrow?... Tomorrow, go out on the streets and talk to the little man in the streets and see what they say about the Senate's repudiation of Louis Farrakhan. It's not worth the paper that it's printed on.  Black people will not respond as you think they will respond.

73. On July 30, 1984, Minister Farrakhan held a press conference at *The National Press Club* in Washington, D.C., to respond to the false charges made by Defendant ADL and other Jewish groups, wherein, in part he said:

The president and the Senate have said, "there is no room in this society for hate and no place for the haters."  We, the victims of America's hatred and bigotry, are now being charged with her crime.  What I represent is truth, and America is saying to Farrakhan what it is written, that the Jews said to Jesus when they rejected him; and Jesus responded, "you cannot understand my words because my words have no place in you."

The Jews in that day wanted no truth to be told if it conflicted with their selfish desires.  They did not care for the truth.  They only wanted to hear that which made them comfortable in their web of lies and deceit.

What crime have I committed that warrants the censure and repudiation of the entire government, religious, and civic leadership?  …I have been a doer of good for Black people for three decades, doing a duty of civilizing and reforming Black people; a duty which America failed to do. For which of the good works that I do in the name of my Father, the Honorable Elijah Muhammad, that you stone or repudiate me?

74. Minister Farrakhan has for decades vociferously opposed Defendant ADL's repeating the false and indefensible statement that "Judaism is a gutter religion."

75. One of the most egregious and audacious frontal assaults from Defendant ADL, by way of the Jewish Defense League, a then-branch of Defendant ADL, was their appearance at a lecture by Minister Farrakhan in Los Angeles, California, on September 14, 1985, when

they paraded outside the entrance to the Los Angeles Forum chanting, "Who do you want? Farrakhan.  How do you want him? Dead!"

76. Minister Farrakhan knew the miscreants who were calling for his death did not represent all Jewish people, and not once did he direct anyone to harm those members of Defendant ADL who were calling for his death.

77. Even in the emotionally charged climate, that did not stop Minister Farrakhan from seeking a dialogue with those who hated him.

## MINISTER FARRAKHAN'S NUMEROUS EFFORTS TO DIALOGUE WITH HIS FALSE ACCUSERS

78. At the same lecture, on September 14, 1985, at the Los Angeles Forum, in a lecture entitled "Power at Last Forever," Minister Farrakhan stated the true reason for the opposition against him and the Nation of Islam is a problem of a theological viewpoint based on his assertion that Black people are the real children of Israel.

79. Therein, he said:

> I am declaring to the world that you, the Black people of America and the Western Hemisphere, are the lost, the rejected, the despised, the prodigal son, the lost sheep, the God's people.  You are the people of God. Now, this is not a problem of antisemitism. This is a problem of theological viewpoint… So, the best thing you can do is tell the people I'm a hater, I'm a bigot, I'm an anti-Semite?...  I just challenged the Jewish scholars.  Show me the history of your suffering in Egypt for 400 years.  I know you can't show it to me, that's all I'm saying; it's not violence, it's not antisemitism, it's a theological argument.

80. It is this theological divergence that has prompted the vociferous attacks on Minister Farrakhan from Defendants.

81. Minister Farrakhan has repeatedly sought to dialogue with members of the Jewish community to attempt to clear up matters that have been made murky by certain misrepresentations of the truth.

14

82. In addition to the instances noted in previous paragraphs, Minister Farrakhan has made the following additional attempts to meet and dialogue with members of the Jewish community:

    a. In early 1994, responding to the call of Allah (God), Minister Farrakhan called for a million men to come to Washington, D.C. on October 16, 1995, and nearly two million men were in attendance at the Million Man March. At the march, Minister Farrakhan called for dialogue with the Jewish leaders, to which they rejected, including Abraham Foxman, former Executive Director of Defendant ADL. (Exhibits F and F-1)

    b. On June 24, 2010, Minister Farrakhan sent a formal written communication to Abraham Foxman and to the 12 presidents of major Jewish organizations. The letter contained copies of the Nation of Islam Research Department's books, entitled, *The Secret Relationship Between Blacks and Jews*, *Volumes 1 and 2*. The letter asked for dialogue with them and pointed out their ability to help him in the Mission he was given. (Exhibit G)

    c. During an interview with Dr. Michael Eric Dyson, on August 10, 2010, Minister Farrakhan made, yet another call for a dialogue with the Jewish community, wherein he said:

> I've been trying to have a dialogue with them for many years. But the dialogue has to be an informed dialogue based on an accurate account of history… I'm not interested in anybody hating Jewish people, or punishing Jewish people. What I am asking, though, is that a serious dialogue take place between them and us.

83. This sincere request for a dialogue between Minister Farrakhan and leaders of the Jewish community has yet to happen.

15

## ANTI-DEFAMATION LEAGUE (ADL)

84. Defendant ADL purports to be a civil rights organization.

85. Its actions, however, demonstrate that it is an un-American organization and has woven itself into the fabric of both the United States government, in general, and into state and local governments within America, in particular, to advance interests that are un-American to the extent that it tramples and trammels upon the Constitutional rights of Minister Farrakhan, the Nation of Islam, and the American citizens.

86. Defendant ADL has proven to be the chief proponent of the false labeling of certain persons as being "anti-Semitic."

87. As early as the 1940s, the Nation of Islam, and its eternal leader, the Most Honorable Elijah Muhammad, were the targets of Defendant ADL's unconstitutional and unwarranted attempts to destabilize and neutralize the Nation of Islam and its leadership.

88. A secret 1942 Anti-Defamation League of B'nai B'rith memo entitled, "Temple of Islam Infiltration," states that a "Negro employed by us" proved "quite instrumental" in an F.B.I. raid on the Temple of Islam for alleged pro-Japanese activities, which resulted in the unlawful arrest of 82 members of the Nation of Islam.  (Exhibit H)

89. Based upon this secret file, Defendant ADL paid an agent to infiltrate the ranks of the Nation of Islam, and then manufactured false evidence that resulted in the arrest of dozens of its peaceful and law-abiding members.

90. Based upon this history, as early as 1942, Defendant ADL performed the function of investigating and gathering information on behalf of the F.B.I.

91. In addition, F.B.I. Director J. Edgar Hoover, in a January 17, 1968, memorandum, ordered each of the F.B.I. field offices to establish formal relationships with Defendant ADL, wherein governmental functions would be shared between the two, including the sharing

16

of other protected information and activity of private persons with the government.

(Exhibit I)

92. In that order, the F.B.I. Director also acknowledged that some liaisons with Defendant

ADL had already been established by some F.B.I. field offices.

Specifically, he wrote:

> As you know, this organization, like the bureau, is opposed to groups and individuals espousing bigotry, prejudice, and extremism. It seeks to bring the true facts concerning such groups and individuals to light. In the furtherance of these worthy objectives, the antidefamation league receives considerable information of interest to this bureau and has been very cooperative in the past in referring such data to us.
>
> You are to immediately make certain that you have established liaison with the head of the antidefamation league regional office in your territory and explain the jurisdiction and interest of this bureau. For your information, there is attached a list of antidefamation league regional offices." (*Id.*)

93. Recent directors of the F.B.I., one retired and the other currently serving as director, have

made public statements further acknowledging Defendant ADL's continued close and

intimate relationship with the F.B.I.

94. For instance, on May 8, 2017, while he was still serving as director of the F.B.I., James

Comey delivered a speech to Defendant ADL entitled, "The F.B.I. and the ADL: Working

Together to Fight Hate" wherein he said that the F.B.I. was not only working with

Defendant ADL, but in a cringeworthy way, said the F.B.I., was "in love" with them.

95. Specifically, he said:

> I first met with you in the spring of 2014, when I was relatively new on the job—just seven months in. I sang your praises as an organization that fights for inclusivity and diversity, equality, and justice.
>
> An organization that works with us to fight hate crime and terrorism, to educate law enforcement, and to build bridges with underrepresented communities. I labeled that last speech, "A Love Letter to the ADL." Three years later I can say, from the perspective of the F.B.I., we're still in love with you. (Exhibit I-1)

96. Who knew the F.B.I. was "in love" with Defendant ADL before Mr. Comey said that?

17

97. Current director, Christopher Wray, reaffirmed this same sentiment of the F.B.I.'s continual, and apparently intimate, relationship with, and reliance upon, Defendant ADL, in some remarks he made on November 10, 2022, when he said to Defendant ADL:

> And I want to thank the ADL today for your support in conducting the training that all of our new special agents and intelligence analysts participate in, at the U.S. Holocaust Memorial Museum. Because of your work, our new agents and analysts confront the reality of just how widespread antisemitism, and the willingness to turn hate to action, really are. (Exhibit I-2)

98. This public pronouncement by the director of the F.B.I. establishes a direct link and a "nexus" between the F.B.I., a branch of the Justice Department of the U.S. government, and Defendant ADL.

99. Not only did the director of the F.B.I. incontrovertibly establish a direct link and symbiotic relationship between the F.B.I. and Defendant ADL, but he went on to acknowledge how Defendant ADL performs the public function of "training…all…new special agents and intelligence agents."

100. The F.B.I.'s dependence on Defendant ADL more than sufficiently establishes a deliberate and celebrated "nexus" between the two.

101. Additionally, the direct link between the F.B.I. and Defendant ADL, and the relinquishing and/or sharing of an aspect of its public function of training its "new special agents and intelligence analysts," creates such a "nexus" between the F.B.I. as a governmental agency and Defendant ADL as a private party such that Defendant ADL's actions become the act of the government.

102. The activities of Defendant ADL are so entwined with those of the F.B.I., and various local and state police departments, that it literally functions as a governmental actor that can be held liable for violating a person's constitutionally protected rights.

103. In 1993, the San Francisco Police Department discovered that Defendant ADL, acting under the color of federal and state law, illegally spied on at least 15 civil rights groups and individuals.

104. The scope, depth, and breadth of the illegal and unconstitutional surveillance activities of Defendant ADL is described by author Jabeer Abara, in his 1993 article in *Covert Action Quarterly 45*, entitled, "The Anti-Defamation League: Civil Rights and Wrongs," wherein he stated:

> For decades, the Anti-Defamation League of the B'nai B'rith has run a private nationwide spy network - a systematic, long-term, professionally organized political espionage operation complete with informers, infiltrators, money laundering, code names, wiretapping, and secret meetings. While it is not unusual for private political groups to gather information, ADL spying is different. It is not only the scale which sets it apart - files on 950 organizations and nearly 10,000 individuals -but the focus.
>
> The ADL spied on groups which opposed its stated goals as well as those which supported its principles. More disturbing, however, is the League's collaboration with state, federal, and foreign intelligence gathering entities. This sharing of often confidential information and resources is not only illegal, but a violation of trust, a threat to civil liberties, and an infringement on the right to privacy. (Exhibit J)

105. On October 24, 1993, *The New York Times* published about this occurrence of Defendant ADL spying on individuals and other groups in an article entitled, "Anti-Defamation League Accused of Spying." (Exhibit K)

106. In August of 2020, a coalition of progressive groups with approximately 195 signatories published a primer entitled, "THE ADL IS NOT AN ALLY."

The aim and objective of that coalition of progressive groups was, among other things, to warn people about the deception of Defendant ADL, and to highlight how its unconstitutional surveillance activities, and its extensive law enforcement and intelligence relationships, were being used to spy on Americans.

107. The Primer stated, in part:

> The Anti-Defamation League (ADL) has branded itself as a civil rights organization in ways that conceal and legitimize its right-wing activities undermining the rights of Black, immigrant, queer, Muslim, Arab, and other marginalized communities. Many progressive individuals and organizations partner with the ADL not knowing its ongoing legacy of supporting racist policing, surveillance, colonialism, and the silencing of social justice activism. Misinformation about the ADL's work, and its credibility in progressive circles, are what allow the ADL to continue harming social justice movements.
>
> The following primer was compiled by organizations across the US working in coalition for freedom, justice, and equality…. Many conflicts between the ADL and our movement are not covered in this primer. Community efforts to resist the ADL are also not covered here……visit DropTheADL.org. (Exhibit L)

108. This pattern and history of Defendant ADL's nearly 83 years of illegal surveillance and data gathering on groups and persons, in joint action with federal, state, and local law enforcement agencies, to be used for targeting groups whose views or policies Defendant ADL disagrees with, is at the most egregious levels of the violation of constitutional rights, as secured by the U.S. Constitution and the Bill of Rights.[6]

109. Upon information and belief, the joint action between Defendant ADL and the F.B.I. continues in illegal surveillance and monitoring of Minister Farrakhan and the Nation of Islam, up to this very day.

110. Defendant ADL's obsession with maliciously defaming Minister Farrakhan and violating his constitutional rights concretized in the 1990s when it unleashed reports on him continuing to falsely label him an "anti-Semite," and espousing antisemitism, such as the following:

   a. In a 1990 ADL Report entitled, "The Campaign to Manipulate Public Opinion: A Study in the Packaging of Bigotry." (Exhibit M)

---

[6] See, *Quigley v. Rosenthal*, 327 F.3d 1044 (2003).

b. In a 1992 ADL Report entitled, "The Anti-Semitism of Black Demagogues and Extremists," Defendant ADL defamed Minister Farrakhan when it falsely referred to him as, "anti-Semitic and racist[.]" (Exhibit N)

c. In the same 1992 report, Defendant ADL went on to state, "He is the most popular speaker on campus among Black students. In his public appearances, Farrakhan continues to repeatedly inject anti-Semitism into his remarks, while paradoxically attempting to rationalize and explain away earlier anti-Jewish statements." *Id*.

111. Upon information and belief, Defendant ADL immediately went to work to infringe upon Minister Farrakhan's ability to freely speak, particularly on Black college campuses.

112. Upon information and belief, said infringement efforts came, among other ways, by threatening the administrators of various colleges and universities with repercussions if they allowed him to speak on their campuses, unnecessarily scrutinizing the use of funding for his visit by the school organization or group that invited him to speak, fostering the imposition of additional fees for the same organization or group, as well as establishing other onerous requirements.

113. In support of that perspective, in a 1994 ADL Report entitled, "Mainstreaming Anti-Semitism: The Legitimation of Louis Farrakhan," Defendant ADL openly and brazenly acknowledged how it would take whatever steps it deemed necessary to interfere with, violate, and infringe upon Minister Farrakhan's constitutional rights under the First Amendment freedom of speech, free exercise of religion, and freedom of association when it noted, in part:

> The ADL is not going to make Farrakhan go away. What we can and should do is impose an obligation on those who deal with him, or, as in the case of universities, give him a platform. (Exhibit O)

114. Other unjustifiably disparaging reports on Minister Farrakhan include:

    a. 1994 ADL SPECIAL REPORT, "Louis Farrakhan: In His Own Words-1994," (Exhibit P)

    b. 1994 ADL RESEARCH REPORT, "Farrakhan Unchanged: The Continuing Message of Hate, The Ongoing Record of Racism and Anti-Semitism by Louis Farrakhan and the Nation of Islam, February-March 1994," (Exhibit Q)

    c. 1995 ADL FACT FINDING REPORT, "Federal Funds for NOI Security Firms: Financing Farrakhan's Ministry of Hate," (Exhibit R)

    d. 1995 ADL FACT FINDING REPORT, "The Other Face of Farrakhan: A Hate-Filled Prelude to the Million Man March," (Exhibit S) and

    e. 1995 ADL RESEARCH REPORT, "The Nation of Islam: The Relentless Record of Hate (March 1994-March 1995)." (Exhibit T)

115. Defendant ADL's obsession with mischaracterizing and defaming Minister Farrakhan carried on into the 2,000's.

116. On or about March 8, 2012, Defendant ADL posted an online article, "Merchants of Hatred," wherein it defamed Minister Farrakhan as, "the antisemitic, racist, and homophobic leader of the Nation of Islam." (Exhibit U)

117. On or about January 12, 2013, Defendant ADL posted an online article entitled, "Farrakhan: In His Own Words," wherein it intentionally misrepresented Minister Farrakhan as undertaking "a wide-ranging campaign specifically targeting the Jewish community …Farrakhan has alleged that the Jewish people were responsible for the slave trade and that they conspire to control the government, the media and Hollywood, as well as various Black individuals and organizations."

118. Defendant ADL knowingly failed to state that Minister Farrakhan was speaking from the books, *The Secret Relationship Between Blacks and Jews*, *Volumes 1 and 2*, which cite Jewish scholars and researchers who have written that some Jews were instrumental in the slave trade, and that some Jews do control aspects of media and Hollywood.

119. To this point, on or about December 19, 2008, a Jewish man by the name of Joel Stein wrote an article in *The Los Angeles Times* entitled, "Who runs Hollywood? C'mon," wherein he expressed consternation at the thought that Jews do not run Hollywood.

120. Specifically, he wrote in said article:

> I have never been so upset by a poll in my life. Only 22% of Americans now believe "the movie and television industries are pretty much run by Jews," down from nearly 50% in 1964. The Anti-Defamation League, which released the poll results last month, sees in these numbers a victory against stereotyping. Actually, it just shows how dumb America has gotten. <u>Jews totally run Hollywood</u>.

> How deeply Jewish is Hollywood? When the studio chiefs took out a full-page ad in *The Los Angeles Times* a few weeks ago to demand that the Screen Actors Guild settle its contract, the open letter was signed by: News Corp. President Peter Chernin (Jewish), Paramount Pictures Chairman Brad Grey (Jewish), Walt Disney Co. Chief Executive Robert Iger (Jewish), Sony Pictures Chairman Michael Lynton (surprise, Dutch Jew), Warner Bros. Chairman Barry Meyer (Jewish), CBS Corp. Chief Executive Leslie Moonves (so Jewish his great uncle was the first prime minister of Israel), MGM Chairman Harry Sloan (Jewish) and NBC Universal Chief Executive Jeff Zucker (mega-Jewish)…

> The person they were yelling at in that ad was SAG President Alan Rosenberg (take a guess). The scathing rebuttal to the ad was written by entertainment super-agent Ari Emanuel (Jew with Israeli parents) on the Huffington Post, which is owned by Arianna Huffington (not Jewish and has never worked in Hollywood.)

> The Jews are so dominant, I had to scour the trades to come up with six Gentiles in high positions at entertainment companies. When I called them to talk about their incredible advancement, five of them refused to talk to me, apparently out of fear of insulting Jews. The sixth, AMC President Charlie Collier, turned out to be Jewish.

> As a proud Jew, I want America to know about our accomplishment. Yes, <u>we control Hollywood</u>. Without us, you'd be flipping between "The 700 Club" and "Davey and Goliath" on TV all day.

So I've taken it upon myself to re-convince America that Jews run Hollywood by launching a public relations campaign, because that's what we do best. I'm weighing several slogans, including: "Hollywood: More Jewish than ever!"; "Hollywood: From the people who brought you the Bible"; and "Hollywood: If you enjoy TV and movies, then you probably like Jews after all."

…I called ADL Chairman Abe Foxman…He [said]…the number of people who think Jews run Hollywood is still too high… "…What is true is that there are a lot of Jews in Hollywood," he said. Instead of "control," Foxman would prefer people say that many executives in the industry "happen to be Jewish," as in "all eight major film studios are run by men who happen to be Jewish."

But Foxman said he is proud of the accomplishments of American Jews. "I think Jews are disproportionately represented in the creative industry. They're disproportionate as lawyers and probably medicine here as well," he said…

But I don't care if Americans think we're running the news media, Hollywood, Wall Street, or the government. I just care that we get to keep running them. (Emphasis added.) (Exhibit U-1)

121. In this article, Mr. Stein unabashedly and unequivocally exclaimed, "Jews totally run Hollywood."

122. Upon information and belief, Defendant ADL never called Mr. Stein "anti-Semitic" for telling the undeniable truth.

123. Mr. Stein, in this quite revealing article, let the proverbial "cat-out-of-the-bag" when he intimated that the objective of Defendant ADL is to get less people to believe that "Jews totally run Hollywood," and to get other people too afraid to speak the truth for fear of being called, "anti-Semitic."

124. In other words, Defendant ADL's false use of the term "anti-Semite," "anti-Semitic," and "antisemitism," in its quasi-governmental capacity completely erodes the protections guaranteed to the American public in the First Amendment to the U.S. Constitution, and to eviscerate the right of every non-Jewish American citizen to speak the truth about anyone at any time irrespective of whether it aligns with someone else's aims and objectives.

125. Said plainly, Defendant ADL uses the term "anti-Semitic" as a "trick," and as a bludgeon, to beat people into submitting to its will, and their actions, in this regard, are not in alignment with the will of "The Founding Fathers" of the United States of America.

126. On August 14, 2002, on a program entitled, "Democracy Now," a former Israeli official by the name of Shulamit Aloni, made this very point when she said regarding the false use of the phrase, "anti-Semitic:"

> Well, it's a trick.  We always use it… When, in this country, people are criticizing Israel, then they are "antisemitic." And the organization is strong, and has a lot of money, and the ties between Israel and the America Jewish establishment are very strong and they are strong in this country, as you know. And they have power, which is OK. They are talented people, and they have power and money, and the media and other things; and their attitude is "Israel, my country, right or wrong…."
>
> And it's very easy to blame people who criticize certain acts of the Israeli government as 'antisemitic,' and to bring up the Holocaust, and the suffering of the Jewish people, and that is [to] justify everything we do to the Palestinians.[7]

127. Upon information and belief, Defendant ADL knows that falsely labeling someone as "anti-Semitic" is a "trick" to manipulate, to punish, and/or to cause others to stay away from saying and/or doing anything that is critical of Defendant ADL, or its interests.

128. Nevertheless, Defendant ADL went on to mischaracterize Minister Farrakhan's words to incite outrage when it claimed Minister Farrakhan "denies the legitimacy of Judaism." (Exhibit V)

129. On or about August 2, 2013, Defendant ADL, in an online post entitled, "Nation of Islam Leader Reprises 'Vintage' Anti-Semitism; ADL Says Farrakhan's Racism 'As Ugly As It Ever Was,'" proceeded to defame Minister Farrakhan as "the racist and antisemitic leader of the Nation of Islam[.]" (Exhibit W)

---

[7] YouTube, www.youtube.com/watch?v=D0kWAqZxJVE

130. On August 5, 2013, Defendant ADL continued its defamatory attacks on Minister Farrakhan in an online post entitled, "Louis Farrakhan Puts His Anti-Semitism On Full Display; Deepens Conspiracy Theories About Jewish Control," wherein it said, "…the antisemitic and racist leader of the Nation of Islam, has returned again to his old bigotry, and ramped up his virulently antisemitic rhetoric in a series of recent speeches." (Exhibit X)

131. On or about February 18, 2019, Defendant ADL further defamed Minister Farrakhan in an online post entitled, "Anti-Semite Louis Farrakhan Teams Up with Notorious Holocaust Denier at Saviours' Day 2019 Conference," wherein it mislabeled Minister Farrakhan as an "anti-Semite." (Exhibit Y)

132. On or about January 17, 2019, in another online post, entitled, "Farrakhan: In His Own Words," Defendant ADL defamed Minister Farrakhan and outright lied when it stated, "He frequently denies the legitimacy of Judaism." (Exhibit Z)

133. Defendant ADL, once again, was unable to specifically quote Minister Farrakhan as denying the legitimacy of Judaism because he has never denied the legitimacy of Judaism or any other revealed religion.

134. On or about February 28, 2022, on its official website, in an article entitled, "Farrakhan Promotes Antisemitism Anti-Vaccine Conspiracies in 'Swan Song' Saviours' Day Address," Defendant ADL referred to Minister Farrakhan's words as containing, "antisemitic, bigoted and conspiratorial rhetoric." (Exhibit AA)

135. On or about March 14, 2022, in an online article entitled, "Farrakhan's Latest Antisemitic, Anti-Vaccine Address Garners Over Half Million Views on Facebook and YouTube," Defendant ADL described Minister Farrakhan as espousing "antisemitism." (Exhibit BB)

136. Upon information and belief, Defendant ADL has labeled countless others with the false label of "anti-Semite" because something may have been said that did not comport with their policies, especially, regarding the Palestinian People or criticizing the conduct of any Jewish person, and/or the state called Israel.

137. Even luminaries such as former President Jimmy Carter, Bishop Desmond Tutu, and former South African President Nelson Mandela, who are known for their balanced struggle for human rights, have been labeled "anti-Semitic" for simply speaking favorably about the Palestinian people.

138. Prominent Black activists like Andrew Young, Reverend Jackson and Kwame Ture have been castigated as "anti-Semites."

139. Black entertainers like rapper and actor Ice Cube and sports figure DeSean Jackson have been labeled "anti-Semites" by Defendants ADL and SWC for simply expressing something positive or favorable about Minister Farrakhan and/or the Nation of Islam. (Exhibit CC)

140. In 2018, newscaster Marc Lamont Hill was fired from his on-air, political commentary position with CNN because he expressed support for Palestinian people in their call for justice.

141. In 2023, Defendant ADL labeled comedian and social analyst Dave Chappelle an "anti-Semite," because they did not like what he said during his monologue on Saturday Night Live, although they never claimed he lied about anything he said.

142. Upon information and belief, none of these Black luminaries have expressed hatred and/or contempt for Jewish people, but they may have said or done something that Defendant ADL determined to be against their interest.

27

143. Upon information and belief, none of these individuals who were labeled as being "anti-Semitic" ever stated that they hated Jews, that they denied the existence of the Jewish Holocaust, or that all Jews are wicked people.

144. Yet, Defendant ADL unceremoniously slapped each luminary with the false label of being an "anti-Semite," which was intended to punish them and to force him or her into submission and/or to inflict maximum economic damage as a warning to others of what would happen to them if they said or did similarly.

145. While Defendant ADL at times seeks to economically disenfranchise others, it has adroitly managed to secure massive funds for itself, such as on December 20, 2022, Defendant ADL sent a twenty-two (22) page written communication directed to the U.S. Office of Management and Budget (hereinafter, "OMB"), which requested an increase in funding for its projects and interests. (Exhibits DD and DD-1)

146. In all, Defendant ADL demanded the U.S. government appropriate approximately $1.5 billion of the U.S. taxpayer's money for its own interests and within three days of that demand letter being issued, Defendant ADL's considerable entwinement with members of the U.S. government was established because the funds were approved.

147. The ability to demand $1.5 billion and receive approval in a matter of days is clear evidence of a "direct nexus" and "symbiotic relationship" with the government.

148. What makes this request even more extraordinary is that, at no time should any request for funding be made directly to the U.S. OMB unless it is from a government agency.

149. Upon information and belief, these actions between Defendant ADL, the OMB, and the White House establishes that Defendant ADL acts as a quasi-governmental entity, such that they are government actors.

28

150. Defendant SWC is another nonprofit entity that has a penchant for defaming Minister Farrakhan and the Nation of Islam as being "anti-Semitic."

**SIMON WIESENTHAL CENTER (SWC)**

151. Defendant SWC purports to be a global Jewish human rights activist organization.

152. According to its website, Defendant SWC, "confronts antisemitism, hate, stands with Israel, defends the safety of Jews worldwide, and teaches the lessons of the Holocaust for future generations."

153. Its actions, however, demonstrate that it is also an un-American organization that has woven itself into the fabric of both the U.S. government, in general, and into local governments within America, in particular, to advance interests that are anti-American.

154. In August of 2018, Defendant SWC founder, Rabbi Marvin Heir, exercised influence over a media outlet and directly intervened to interfere with, oppose, and prevent a showing of a documentary on Minister Farrakhan's life in music on the streaming service Netflix, that had been in the works and under contract since January of 2018. (Exhibit EE)

155. According to a *New York Times* article dated August 1, 2018, the day before the documentary was to air on Netflix, "…a number of Jewish organizations and people spoke out in media outlets and on Twitter, or said they reached out to Netflix directly[,]" to demand that it not show Minister Farrakhan's documentary.

156. Specifically, with respect to Rabbi Marvin Heir, according to the article, he said he "immediately called up Netflix chief executive, Ted Sarandos, who told him that a 'glitch' had occurred, and the movie would not be released." (*Id.*)

157. The net result of this interference was the cancellation of the airing of the documentary.

158. This act contributes greatly to comprehending the degree of hatred, ill-will, spite, and malice Defendants, in general, and SWC, in particular, have toward Minister Farrakhan, and it highlights the lengths to which Defendants will go to interfere with something that has nothing to do with them.

159. The article captured Rabbi Marvin Heir's sentiment about Minister Farrakhan when it quoted him as saying, "it would be terrible to give Mr. Farrakhan 'legitimacy' on such a national level by streaming this documentary."

160. Defendant SWC's malice was on full display in this *New York Times'* article, because its founder could say that a documentary would give him "legitimacy" when Minister Farrakhan has earned legitimacy in America, and around the world, for almost a half century.

161. One example of Minister Farrakhan's incontrovertible "legitimacy" as a national and international leader occurred on October 16, 1995, when he was blessed to call a million Black men to Washington, D.C., for the Million Man March, and, as a result of that Divine call, nearly two million showed up.

162. On May 10, 2019, in an online article posted on the SWC's official website, Defendant SWC founder, Rabbi Marvin Heir, defamed Minister Farrakhan again by falsely and maliciously saying of him, "Louis Farrakhan is the Joseph Goebbels of our time."[8] (Exhibit FF)

163. He also called for the removal of Father Michael Pfleger from St. Sabina Catholic Church for hosting and allowing Minister Farrakhan to speak about, upon information and belief, Defendant-inspired ban of Minister Farrakhan from Facebook. (*Id.*)

---

[8] Joseph Goebbels was the chief propagandist for the Nazi Party and the Third Reich from 1933-1945.

30

164. To this point, on or about June 30, 2020, the SWC issued a report announcing the publication of a dossier entitled, "Louis Farrakhan—Four Decades of Bigotry: In His Own Words." (Exhibit GG)

165. The false report published on June 30, 2020, was replete with statements about Minister Farrakhan it knew, or should have known, to be false. (Exhibit HH)

166. On or about June 30, 2020, Defendant SWC boasted on its website how it exercised considerable influence over a media outlet, and caused said outlet to cancel the broadcast of Minister Farrakhan's July 4, 2020, message entitled, "The Criterion."

167. Defendant SWC said on its website regarding said cancellation, "[f]ollowing protests from the Simon Wiesenthal Center last week, Foxsoul.TV dropped its plans to broadcast Louis Farrakhan from its July 4th programming." (Exhibit II)

168. On July 5, 2020, Defendant SWC made an online post that maligned and defamed Minister Farrakhan as, "America's Godfather of Antisemitism."  (Exhibit II-1)

169. On December 29, 2020, Defendant SWC published a report entitled, "The 2020 Top Ten Worst Global Antisemitic Incidents," wherein it defamed Minister Farrakhan with a headline, "Godfather of Hate Spreads Jew Hatred to New Generations." In the report he was third on the list and stating that he had a "35-year campaign against Jews and Judaism." (Exhibits JJ and JJ-1)

170. On or about February 27, 2022, Defendant SWC, once again, maligned Minister Farrakhan in a tweet as, "the godfather of Jew-hatred in the USA[.]" (Exhibit KK)

171. In direct contravention to the false statements spewed by the Defendants, Minister Farrakhan has nothing but admiration and respect for Judaism and those Jewish people who strive to follow the Torah.

## MINISTER FARRAKHAN'S RESPECT FOR JUDAISM AND JEWISH PEOPLE

172. Each of the Defendants claim to be guardians of the Jewish people, in particular, as they survey the landscape of American society looking for any patent or latent indicia of anti-Jewish sentiment.

173. However, it is precisely their failure to acknowledge Minister Farrakhan's respectful statements about Jews and Judaism that exposes its malice toward him and the Nation of Islam and their hypocrisy in the face of truth.

174. Minister Farrakhan honors, respects, and even admires many members of the Jewish community, including his boyhood idol and one of the greatest violinists, Jascha Heifetz, who was a Russian Jew, and his own Jewish violin teachers.

175. Defendants, as noted above, have alleged to have quoted Minister Farrakhan in articles and/or reports that include the caption, "Farrakhan: In His Own Words."

176. As Defendants scour practically every word Minister Farrakhan speaks publicly, and quite possibly some words he speaks privately, they conveniently and intentionally overlooked, disregarded, and turned a blind eye to the following statements that reveal Minister Farrakhan's recognition of, and respect for, Jewish people and Judaism:

   a. On November 17, 1983, in a lecture entitled, "The Dynamic Force of Islam: Its Effect on America," Minister Farrakhan recognized the legitimacy of Judaism, when he said:

   > Because if you are a Christian and you believe in the message of Jesus, and if you are a Jew and you believe in the message of Moses, no matter what your religion is, if it is a revealed religion that came through the prophets of Almighty God, ultimately, we are going to be one, because the same God that sent Jesus into the world sent Moses and Muhammad into the world, and He didn't send them into the world with conflicting ideologies, conflicting philosophies. If God is One, and He is, and His religion is one, and it is, and He is not the Author of confusion, but of peace, you could not

give the blame to God for creating all these different religions on the earth. These religions on the earth, if you look beneath the surface of what is taught, you find principles in Christianity, in Judaism, and Islam that are the same, and it proves that they come from the same Source.

b.  On January 1, 1989, in a lecture entitled, "How to Eat to Live," Minister Farrakhan

acknowledged the existence of "good Jews," when he said:

And the good Jews follow [Moses' dietary law] to this day. And they get a lot of credit for following God's law.

c.  On August 30, 1992, in a lecture entitled, "Food, Clothing, and Shelter: The Vision

of the 3-Year Economic Program," Minister Farrakhan denied calling Judaism a

"gutter religion," when he said:

Don't put on me that I'm an "anti-Semite." That's not true. That's not true. "Hitler was great, but he wasn't good." That's what I said. I said he was "wickedly great." I spoke the truth. I never called Judaism, "a gutter religion." Every time they write about me in the paper, they'll say, 'Farrakhan, that guy that teaches Judaism is a gutter religion, and Hitler was a great man.' Stop it. You say so many lies, you believe your own. I didn't say that. I was speaking of the State of Israel and her mistreatment of the Palestinians. Don't call me "anti-Semitic" because I disagree with Zionist viewpoint. That's my personal right to disagree with a Zionist point of view. But that doesn't mean I won't come to the synagogue and enjoy seder with you.

On March 19, 1994, in a lecture at the Fresno Convention Center, Minister Farrakhan denied hating Jewish people because of their faith, when he said:

I want the Jews in this audience to know that I don't hate you because of your faith. What kind of man would I be to hate you because you are a Jew when we all claim Abraham as our father? I want you to listen to me. I'm not afraid of you. So, I have no reason to lie. I never called Judaism a "gutter religion." That's what the papers say, and they continue to repeat it when I have clarified for 10 years.

d.  On February 25, 1996, during his Saviours' Day address entitled, "Guidance and

Instruction to the Year 2000 and Beyond," Minister Farrakhan acknowledged the

legitimacy of Judaism as one of the "great revealed religions," and recognized there

are good Jews, when he said:

"Every prophet of God said, "I submit to obey God and whatever God commands me to do, that I do." Abraham bowed to God, and all the prophets of these three great revealed religions of Christianity, Judaism, and Islam, all of them bowed down to the will of God... "

"When you submit to God, all our words and our actions reflect Him to whom we submit. And you know, and I know that it's a struggle every day to submit our will to do the will of God and sometimes we are alright and other times we don't do so good. So, a Muslim, and a good Christian, and a good Jew is always struggling against the flesh, to submit to God."

e.   On June 2, 1996, in a lecture Fear, Faith, and Truth," Minister Farrakhan

acknowledged the legitimacy of Judaism when he said:

When I told members of the Jewish community that I wasn't condemning the religion of Judaism as such… God knows the truth and there's nothing you can do to me unless God pleases. So, if I tell you that I did not mean to insult the religion of Judaism, then accept that because I'm not a liar.

f.   On February 22, 1998, during his Saviours' Day address, Minister Farrakhan

recognized "good Jews," when he said:

I want to know when will the good Jews stand up against the Jews that are not good? When will the good Jews, point out the bad Jews….

g.   On February 27, 2000, during his Saviours' Day address, Minister Farrakhan

demonstrated his appreciation for members of the Jewish faith when he said:

To the Muslim community worldwide, I can never thank you enough for your prayers for my recovery, thank you.  To the Christian community, Black, white, and Asian, thank you for your prayers.  And to those members of the Jewish faith, both the original Hebrew Israelites under the leadership of Rabbi Ben Ami headquartered in Demona, Israel, and those members of the orthodox Jewish faith and many others, who have prayed and continue to pray for me, I thank you from the depth of my heart.

Moreover, and contrary to how the Defendants have misrepresented Minister

Farrakhan to the world, in general, and to members of their Jewish community, in

particular, Minister Farrakhan's demonstration of appreciation and respect for

members of the Jewish faith was on full display when he permitted Jewish rabbis

34

to share his stage at the annual convention of the Nation of Islam and to have some

words to say on the Sunday program.



*Figure 1 - Saviours' Day, February 27, 2000*

On February 25, 2001, during his Saviours' Day address entitled, "Make Straight

in the Desert a Highway for Our God," Minister Farrakhan recognized the

legitimacy of Judaism as a religion when he said:

> From the Christian perspective, I bear witness that Jesus is the Christ. From the Muslim perspective, I bear witness that the Mahdi [is] the self-guided One… I bear witness to the Jews and the Hebrews, who await the Messiah. You were wise to await him…
> But after Satan's time of rule is up, the righteous should be looking for the coming of and the presence of God. Now, if Satan has had power, his power is most prominent in religion. Whether it's Islam, Christianity, or Judaism, or Buddhism, whatever your religion is, Satan didn't leave you alone.

h. On July 23, 2001, during an address regarding the African Union, Minister

Farrakhan recognized the legitimacy of Judaism and truth contained therein when

he said:

> Whether our religion is Christianity, Islam, or Judaism, the fact is that racism has poisoned the bloodstream of the monotheistic religions of the

world. So, it becomes our duty, now, to take the truth of Judaism, the truth of Islam, and the truth of Christianity and drive racism out of it. Then, and only then, can religion be an active participant in the liberation of the human spirit.

i.  On September 16, 2001, during a press conference at Mosque Maryam after the attack on the World Trade Center on September 11th, Minister Farrakhan recognized the legitimacy of Judaism when he said:

> I would humbly, humbly advise and implore the president of the United States, before he takes this country into war, to counsel with scriptural scientists who are among the Jews, the Christians, and the Muslims. There are those who have given their lives to the study of prophecy and can advise him so that as we put on the armor of battle, we have to put on the whole armor of God….
> And it seems as though the political people cannot bring it about. So, those who are religious scientists must rise to the occasion. The children of Abraham, Muslims, Christians, and Jews, pooling the best of our knowledge of scripture can help to solve that problem…
> We cannot march off into war saying, 'Hip, hip, hooray.' We have to march off into war guided by the knowledge of what this is, and if we can avert war, we should do everything we can to avert it because 'blessed are the peacemakers for they shall be called the children of God.' I would appeal to the scriptural scientists among us, those of Judaism, Christianity, and Islam, to be utilized by President Bush to help him to understand this hour from what the prophets saw and predicted.

j.  On August 26, 2002, during an interview with Phil Donahue, Minister Farrakhan acknowledged the existence of "good Jews…that are righteous" when he said:

> Now, are there good Jews? Of course, there are. Are there Jews that are righteous? Of course, there are. Are there Jews that have benefited Black people? Of course, there are. We don't put those righteous persons in a class of those that are not good any more than you put indecent Blacks in the class of those that are doing good."

k.  On June 25, 2005, at the GAEBO Convention Center in Savannah, Georgia, Minister Farrakhan publicly acknowledged his admiration for Jewish people when he said:

> I want the Press to know I've never been an 'anti-Semite.' I don't hate the Jewish people.  I never have. I'm an admirer of the Jewish people

36

because they lead in every field of human endeavor. Without Jewish science and Jewish technology, Jewish medicine, I mean, they've advanced their fields.  I don't have any problem with that… But the Jews are not so sacrosanct that they are above critical analysis. Don't get upset with me because I see you.  It's not about hate. It's about that freedom of people that cannot rise if you're sitting on them…

See, I'm not against the Jewish people. I want you to know that. I have never, ever, ever done anything to hinder a Jewish person from getting a job, or advancing in the society. I've never picketed a Jewish store. When we don't have Halal meat, I go to the kosher meat market, and I spend my money with you. I've never asked [anybody] to boycott a Jewish store. Check my record. We have never, ever put any graffiti on a synagogue because our religion teaches us to protect any house where God's name is remembered.

l.   On September 14, 2005, in a lecture entitled, "The Time of Trouble-America Must

Reap What She Has Sown," Minister Farrakhan acknowledged his respect for

Jewish people, when he said:

I have never hated the Jewish people. I have always respected them. But what I have always been against is the level of control that they exercise over Blacks in politics, Blacks in culture, Blacks in academia.  I have not spoken in a Black college for years because they poison Black presidents and frightened them that Farrakhan should not come on the campus and speak to young Black men and women. I could not come to Morehouse.
I could not come to Morris Brown. I could not come to A&T. I could not come to Howard. No Black school because they had a stranglehold on Black presidents; that a man like Farrakhan should not be allowed to speak to young Black men and women, not because I don't have something to say. But because Farrakhan knows the truth, the truth that Jesus said would set us free.

m.  On October 15, 2005, on the mall in Washington, D.C., during the Millions More

Movement, Minister Farrakhan recognized the legitimacy of Judaism, along with

Islam and Christianity, when he said:

And lastly, we need a ministry that deals with the head, the spirit of our people, where we collect our spiritual leaders of Christianity, and Islam, and Judaism, and all other religions, and come up with the spiritual teaching that will transform our lives by renewing our minds[.]

n.  On May 7, 2007, during a CNN interview with Don Lemon, Minister Farrakhan

articulated his respect for Jewish people and their faith tradition when he said:

> I've never been an anti-Semite from the depth of my heart. I know that I've never hated the Jewish people. And for me to hate a Jewish person because of their faith tradition would make me less than a Muslim, less than a righteous person, and would make me a bigot, and a wicked person…People were calling me 'the new Black Hitler.' I have never pulled or plucked one hair from the eyebrow of a Jewish person. I trade with Jewish stores right now. I, if I can't find something that is Halal, I go to the kosher store to buy the food.
>
> So, please, if I were anti-Semitic, if I hated the Jewish people, I would organize boycotts against their businesses. You wouldn't see a Muslim putting a swastika on a Jewish synagogue because our Qur'an forbids us, and even advises us, if we see someone doing that to a church or a synagogue or a cloister, that we should stop them from doing so.

o.  On July 3, 2008, during the Emancipation Day celebration in St. Croix, Minister

Farrakhan articulated his non-hatred of the Jewish people when he said:

> Now, they call me "anti-Semitic." I hate that appellation or name applied to me because I have never been hateful of the Jewish people, never. Critical? Yes. Hateful? No.

p.  On June 24, 2010, in a letter to then-Director of Defendant ADL Abraham Foxman

as well as to other leaders of Jewish organizations, Minister Farrakhan wrote,

among other things:

> The charge of anti-Semitism has been leveled against Elijah Muhammad, Malcolm X, and the Nation of Islam for many years. For 25 of the 33 years of my rebuilding of the Nation of Islam, I and we, in the Nation of Islam, have suffered under the charge of "anti-Semitism"…
>
> As you have constantly labeled me and done everything within your power to hinder me and us from the civilizing work that Allah (God) has given to  Elijah Muhammad and myself to do, I ask you to find one act committed by me, or those who follow me, that has injured one Jewish person, stopped Jews from doing business, hindered their education, injured their families, sullied or desecrated their synagogues. You will not find one.
>
> So, except for our willingness to tell the truth and our unwillingness to apologize to you for telling the truth, on what basis do you charge me and us as being 'anti-Semitic?'…I have pleaded with you over the years for a sensible, intelligent dialogue. You have rejected me, and some Rabbis have given me terms for friendship that any self-respecting person could never

38

accept. So, with this truth in our hands and yours, and soon in the hands of tens of thousands, I again ask you for a dialogue.

q. Lastly, on July 4, 2020, during "The Criterion" lecture, Minister Farrakhan articulated his non-hatred of the Jewish people when he said:

> You really think that I hate the Jewish people? You do not know me at all. You that have been in my close conversations, have you ever heard me utter the words of death to the Jewish people? (Note: The answer was a resounding, "No!")

177. These quotes and many others identify Minister Farrakhan's positive perspective on Judaism and those Jewish people who strive to be righteous.


## **FACTS**

### **ADL / JONATHAN GREENBLATT**

178. At ADL.org, Defendant ADL states:

a. "The Nation of Islam (NOI), the largest Black nationalist organization in the U.S., has maintained a consistent record of antisemitism and bigotry since its founding in the 1930s."

b. "Some mainstream figures, including elected officials and celebrities, have publicly supported the NOI, focusing on the group's efforts to bolster Black self-reliance while minimizing or not acknowledging the NOI's well-established record of bigotry and antisemitism, giving this hateful rhetoric a measure of legitimacy."

179. The issue becomes what Defendant ADL defines as "anti-Semitic," or "antisemitism."

180. Merriam-Webster Dictionary, the leading dictionary in America, defines the word "Semite" as, "a member of any of a number of peoples of ancient southwestern Asia including the Akkadians, Phoenicians, Hebrews, and Arabs." (Exhibit LL)

181. Based upon this definition of the word "Semite," from the nearly 200-year-old Merriam-Webster Dictionary, multiple groups of people are historically and legitimately described under the title, "Semite."

182. By definition, anyone who is labeled "anti-Semite" would be a person who dislikes, hates, and/or attacks a person, or persons, of one of the multiple groups of people who have historically and legitimately been defined as a "Semite."

183. Defendant ADL, however, has crafted its own definition of the word "Semite" and "Semitic" to mean only those people who identify as Jewish.

184. No one group of people own the word "Semite" because, for thousands of years, it has belonged, and still belongs, to multiple groups of people.

185. In fact, any one group of people who seeks to ascribe solely to itself the label of "Semite" to the exclusion and denial of the other multiple groups of Semitic people, is, in fact, being "anti-Semitic."

186. Nevertheless, Defendant ADL has ascribed to itself the ability to make up a new definition for the words "anti-Semite," "anti-Semitic," and "antisemitism," and has sought to impose its arbitrary definition on the public and the Executive, Legislative, and Judicial branches of government, including their respective governmental agencies.

187. For instance, to be labeled an "anti-Semite," or as "anti-Semitic," by Defendant ADL, and others, includes, but does not require a person to say or do something harmful or hateful to Jewish people.

188. The false use of those labels, that fit into its own arbitrary definition of those words, includes anyone who would dare to say anything that is contrary to its interests or against what is called the state of Israel.

189. Moreover, irrespective of the truth of any statement made that it does not like, on its website, Defendant ADL lists the following "tropes" that, from its perspective, would warrant the label of "anti-Semite," or "anti-Semitic" if someone used any one of them:

    a.  Jews have too much power,

    b.  Jews are disloyal,

    c.  Jews are greedy,

    d.  Jews killed Jesus,

    e.  Jews use Christian blood for religious rituals,

    f.  The Holocaust didn't happen, and

    g.  Anti-Zionism or delegitimization of Israel. (Exhibit MM)

190. This arbitrary and expanding list of what Defendant ADL determines to be instances of "anti-Semitism" amplifies the perspective of one writer who one wrote, "'anti-Semite' used to mean a man who hated Jews.  Now, it means a man who is hated by Jews." (Exhibit NN)

191. Several of Minister Farrakhan's student ministers have been falsely labeled as "anti-Semitic" by Defendant ADL as well.



41

192. Falsely identifying and labeling someone as an "anti-Semite," as "anti-Semitic" and espousing "antisemitism" are not opinions, they are statements of fact that are capable of being proved false.

193. These false labels of antisemite, anti-Semitic and antisemitism is specific language that has a precise meaning that is readily understood by anyone who hears it and anyone who reads it.

194. The context in which the false labels and statements appear indicates to the hearer or the reader that the statement is a fact.

195. A reasonable hearer or reader would conclude that the false statements of "anti-Semite," "anti-Semitic," "antisemitism", and articles conveying such false statements were conveying facts about the plaintiff.

196. To this point, on October 3, 2022, Regional Director for Defendant ADL of New York and New Jersey, Scott Richman, under the leadership of its' CEO Defendant testified at a hearing before the Committee on Homeland Security, House of Representatives, 117th Congress.

197. The specific title of the hearing was "Countering Violent Extremism, Terrorism, And Antisemitic Threats in New Jersey."

198. In his written statement, on behalf of Defendant ADL, as a matter of record before this Congressional Committee, Mr. Richman called Minister Farrakhan an "antisemitic individual," which is clearly a statement of fact, that can be proven false. (Exhibit NN-1)

199. The words and deeds of Defendants Greenblatt and ADL are not just words and deeds of an individual or an organization, but are the words and deeds that carry the weight of acting under the color of law.

200. Defendant ADL has a long history of performing governmental functions at every level of government: federal, state, and local.

201. The training of law enforcement officers is a governmental function, and by its own admission on its official website, Defendant ADL trains at least 15,000 law enforcement personnel per year.  (Exhibit OO)

202. Defendant ADL engages in joint law enforcement training sessions with the "F.B.I.".

203. Defendant ADL represents itself as the nation's top "non-governmental" law enforcement training organization on issues of implicit bias, hate crimes, extremism, and community security. (Exhibit PP)

204. Defendant ADL has a law enforcement advisory committee that meets regularly with the F.B.I.

205. Defendant ADL indicated that, as of 2018, in New York and New Jersey, it had trained 1,280 law enforcement officials in recognizing and preventing extremism.

206. Additionally, as of 2018, Defendant ADL had trained 1,593 officials from law enforcement agencies across New York and New Jersey, "in managing implicit bias, Holocaust education, and recognizing hate crimes."  (*Id.*)

207. Upon information and belief, the law enforcement advisory committee meets with high-ranking law enforcement officials where they receive directives from Defendant ADL, and/or where Defendant ADL frames law enforcement policies and objectives.

208. According to Defendant ADL, in 1998 they created the "Law Enforcement and Society" (LEAS) program in Washington D.C., working with the U.S. Holocaust Memorial Museum, and since its establishment, Defendant ADL asserts that it has trained more than 100,000 law enforcement officers.

209. According to Defendant ADL's website:

> Every new F.B.I. Special Agent must go through this training, which has also become standard protocol for several major metropolitan police forces, the Department of Homeland Security and the Bureau of Alcohol, Tobacco, Firearms and explosives…
>
> Federal agencies whose agents are trained in the program include the Federal Bureau of Investigation, U.S. Secret Service, and U.S. Immigration and Customs Enforcement, while local departments include the Washington, D.C., Metropolitan Police Department, the Philadelphia Police Department, and dozens more.
>
> LEAS has also been incorporated into the curriculum of F.B.I. National Academy, the F.B.I. National Executive Institute, and the F.B.I. Law Enforcement Executive Development Seminar. In addition to the original program…. LEAS is also now offered in Houston, Los Angeles, Nassau County (NY), Seattle, St. Louis, and Tampa.  (Exhibit QQ)

210. The scope, depth, and breadth of Defendant ADL's substantial intertwining with law enforcement training at the federal, state, and local levels is staggering.

211. Defendant ADL, under color of law, carries out these governmental functions, including investigating, spying, law enforcement training, and reporting on alleged crimes.

212. Upon information and belief, federal, state, and local agencies not only rely upon Defendant ADL's spying and investigating, but also shares information with them. *Infra*.

213. Historical and present pronouncements by both past and recent F.B.I. Directors acknowledge this governmental function Defendant ADL provides to the U.S. government, in general, and the F.B.I., in particular.

214. Defendant ADL is, in effect, a government-funded functionary of the U.S. government that has utilized its authority under the color of law to label Minister Farrakhan an "anti-Semite," and, in turn, deprived him of constitutional guarantees.

These statements, and others noted herein, form, in part, the basis for the causes of action Minister Farrakhan and the Nation of Islam have brought against Defendants ADL and Greenblatt.

**SWC / Rabbi Abraham Cooper**

215. On or about December 29, 2022, on its official website, Defendant SWC published a document which it entitled, "2022 Top Ten Worst Global Antisemitic Incidents," wherein it maliciously maligned and defamed Minister Farrakhan as "America's Godfather of Hate." (Exhibit RR)

216. On or about December 1, 2022, on its official website, Defendant SWC attempted to justify its false labeling of Minister Farrakhan as an "anti-Semite," when it labeled him as "America's Godfather of Hate," in its attempt to intentionally mischaracterize him to the world. (Exhibit SS)

217. On or about March 1, 2023, SWC published on that same website an article entitled, "SWC: Farrakhan's Annual Saviours' Day Anti-Jewish Tirades Continue As Does Silence of Political and Faith Leaders." (Exhibit TT)

218. The article, which falsely charged Minister Louis Farrakhan as being "anti-Semitic," stated in part, "The Simon Wiesenthal Center is condemning Louis Farrakhan's latest Savior's [Sic] Day Antisemitic and anti-Judaic diatribes during the Nation of Islam's annual conference in Chicago."

219. In that article, Defendant Cooper made false and defamatory statements about Minister Farrakhan, when he said, "We have tracked and denounced Farrakhan and his trail of Jew-hatred and antisemitic incitement for four decades. Yet, the godfather of hate has rarely been publicly criticized." (*Id.*)

220. These malicious statements, and others noted herein, form, in part, the basis for the cause of action Minister Farrakhan has brought against Defendants SWC and Cooper for defamation.

## COUNTS

### COUNT 1

### FIRST AMENDMENT – FREEDOM OF ASSOCIATION - UNDER COLOR OF FEDERAL LAW

### FARRAKHAN V. ADL

221. Minister Farrakhan realleges and incorporates by reference paragraphs 20-217, as though fully set forth herein.

222. The First Amendment to the United States Constitution provides, in part, that, "Congress shall make no law…abridging…the right of the people peaceably to assemble…."

223. Defendant ADL, as a de facto, quasi-governmental actor, while acting under the color of federal law, engaged in activity that unlawfully infringed upon Minister Farrakhan's constitutional right to peaceably assemble and to associate with others who share a common interests in violation of the First Amendment.

224. In support of said statement, on November 22, 2014, Minister Farrakhan spoke to a standing-room-only audience in the 2,000-seat Murphy Fine Arts Center (hereinafter, "Center") on the campus of Morgan State University (hereinafter, "Morgan State").

225. The vast majority of those in attendance shared common interests with Minister Farrakhan, as evidenced by the multiple standing ovations he received during his speech.

226. In addition, some of the students of Morgan State emphatically declared, "[w]e need Minister Farrakhan!" (Exhibit UU)

227. Prior to the event, a writer for *The Baltimore Sun*, however, cited Defendant ADL to support his opposition to Minister Farrakhan's anticipated speaking event on Morgan State's campus in 2014 when he wrote in an article, "[a] complete list of Mr. Farrakhan's long history of Jew-baiting can be found on the website of the Anti Defamation (Sic) League." (Exhibit VV)

228. In 2014, Morgan State's administration, however, rebuffed such opposition and allowed Minister Farrakhan to speak and, thereby, facilitated his association and peaceable assemblage with the school administrators and more than 2,000 of their students.

229. Upon information and belief, after that speaking engagement, Defendant ADL either put pressure on the administration, or threatened to lobby against funding for Morgan State, if the administration allowed Minister Farrakhan to associate and peaceably assemble with them and/or their students ever again.

230. In support of this belief, on or about August 20, 2023, the Nation of Islam submitted an application to Morgan State for the use of the Center as the potential location for Minister Farrakhan to speak on either Saturday, October 14, 2023, or on Sunday, October 15, 2023, in commemoration of the 28th anniversary of the Million Man March. (Exhibit WW)

231. Said event would have been of the exact nature, format, and type of event as the last time Minister Farrakhan spoke in that very same venue on November 22, 2014.

232. On August 22, 2023, however, administrators of Morgan State unceremoniously disassociated itself from Minister Farrakhan when it rejected the application for use of the Center, and, as a result of said rejection, Morgan State administrators refused to allow the speaking event to take place on its campus.

233. In its rejection of the application for use of the Center for said speaking engagement, an administrative assistant for the Center wrote, among other things, "[t]he type of event that you are asking to hold is not suited for our center." (Exhibit XX)

234. The administrative assistant did not provide any further information as to how the proposed speaking event was "not suited" for the Center in 2023 when the exact same type of event was suited for the Center in 2014.

235. Upon information and belief, Defendant ADL became aware of the Nation of Islam's August 20, 2023, application for the rental of the Center.

236. Upon information and belief, Defendant ADL used its power and authority derived from its close association with the federal government, to pressure Morgan State to reject the application that would have allowed Minister Farrakhan to speak on its campus and to associate and assemble with them and their students.

237. In the alternative, upon information and belief, the administration of Morgan State chose to disassociate themselves from Minister Farrakhan and to reject the same type of event it previously allowed on its campus because of the relentless misrepresentation of Minister Farrakhan by Defendant ADL as being, among other things, "virulently antisemitic."

238. Moreover, upon information and belief, members of the Morgan State administration, over the years, have become aware of the social and economic punishment Defendant ADL has ruthlessly exacted upon individuals, institutions, and/or organizations that have, one way or another, associated themselves with Minister Farrakhan and/or the Nation of Islam.

239. Upon information and belief, Morgan State administrators became aware of both Defendant ADL's labeling of Minister Farrakhan as "virulently anti-Semitic" and Defendant's past actions against those who associated with Minister Farrakhan.

240. Upon further information and belief, Morgan State feared reprisal by Defendant ADL as the de facto governmental "anti-Semitic" watchdog of the federal government.

241. Minister Farrakhan maintains that this rejection of the application for him to speak on Morgan State's campus, which, by every reasonable account, constituted a disassociation after a cordial 40-year relationship, was the result of Defendant ADL's direct or indirect actions to impermissibly interfere with, disrupt, and infringe upon his right to freely

associate, assemble, and speak with others of similar interests in violation of the protections guaranteed by the First Amendment.

242. Upon information and belief, Defendant ADL, under its actual status as a quasi-governmental actor, hindered, interfered with, and infringed upon Minister Farrakhan's First Amendment right to freedom of association and freedom of peaceable assembly when it threatened Morgan State with economic and social sanctions if it allowed him to speak at the Center for the 28th anniversary of the Million Man March.

243. The injury resulting from said infringement of Minister Farrakhan's First Amendment right to freedom of association and assemblage was real, actual, and immediate.

Wherefore, Minister Farrakhan respectfully requests this Court find that Defendant ADL violated his First Amendment right to freedom of association and to peaceably assemble, and grant him the appropriate relief.

### COUNT 2

### FIRST AMENDMENT – FREE EXERCISE OF RELIGION - UNDER COLOR OF FEDERAL LAW
### FARRAKHAN V. ADL

244. Minister Farrakhan realleges and incorporates by reference paragraphs 20-217, as though fully set forth herein.

245. The First Amendment further provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

246. Defendant ADL, a de facto, quasi-governmental entity, while acting under color of federal law, has impermissibly interfered with, and continues to interfere with, Minister Farrakhan's right to free exercise of his religion in violation of the First Amendment.

247. Minister Farrakhan's Mission is to deliver the revealed Word of Allah (God) – as found in the Teachings of the Most Honorable Elijah Muhammad – to his people first, and then, to all of humanity.

248. Defendant ADL, however, began implementing a strategy through the Executive Branch of the U.S. government that would result in the continued infringement of Minister Farrakhan's, and others', First Amendment right to free exercise of religion.

249. To this end, on December 5, 2022, at the urging of Defendant ADL, the "House and Senate Bipartisan Task Force on Antisemitism" forwarded a letter signed by 125 members of Congress to President Joseph Biden requesting the creation of an interagency task force out of the White House in the name of combatting "antisemitism." (Exhibit YY)

250. Two days later, on December 7, 2022, the first steps in honoring Defendant ADL's request for the creation of such an interagency task force took place when Vice President Kamala Harris' husband, Douglas Emhoff, hosted a meeting with certain individuals under the caption, "White House Antisemitism Roundtable." (Exhibit ZZ)

251. Five days thereafter, on or about December 12, 2022, the White House announced the creation of that interagency task force to, among other things, study strategies to counter "antisemitism." (Exhibit AAA)

252. Upon information and belief, over the next five months, Defendant ADL conducted additional meetings with White House personnel to concretize the objective of this interagency task force, which was the development and implementation of a national strategy that would employ the human and financial resources of the U.S. government to combat whoever Defendant ADL determines to be an "anti-Semite" or "anti-Semitic," and to combat whatever it determines to be "antisemitism."

253. On May 25, 2023, the White House issued and published "The U.S. National Strategy To Counter Antisemitism." (Exhibit BBB)

254. The creation and implementation of this national strategy is the most recent evidence of the "symbiotic relationship" between Defendant ADL and the U.S. Government, which will likely result in the prosecution of those who Defendant ADL labels as "anti-Semitic."

255. Also on May 25, 2023, Defendant ADL took credit for shaping this national policy by posting on its official website a document entitled, "ADL Shaped White House Strategy to Counter Antisemitism." (Exhibit CCC)

256. Additionally, on that same day, Defendant ADL published on its website a document entitled, "ADL's COMBAT Antisemitism Plan," which mirrors, almost verbatim, the elements of "The U.S. National Strategy to Counter Antisemitism." (Exhibit DDD)

257. Defendant ADL's starting of a process in December of 2022, and completing it by May of 2023, to have a national strategy signed by the president of the United States, establishes the "close nexus" and entwinement between the de facto, quasi-governmental "anti-Semitic" watchdog, known as Defendant ADL, and the federal government.

258. The inauspicious danger associated with Defendant ADL's seemingly indiscriminate determination of who is "anti-Semitic" and what is "antisemitism" is found in the fact that it has become the basis of a major national initiative of the president of the United States, thereby carrying the strength and power of the Executive Branch of the federal government.

259. Defendant ADL has been supported by the federal government in the implementation, and ultimately weaponization, of this national strategy against Minister Farrakhan and the Nation of Islam in particular, because it has spared no expense at repeatedly and falsely labeling both as being "anti-Semitic."  (Exhibit BBB)

260. Defendant ADL's false labeling of Minister Farrakhan as "anti-Semitic" is imposed upon him because it does not like the truth that he speaks, and such behavior is reminiscent of 2,000 years ago when certain Jews of that day could not bear to hear the truth that Jesus spoke about them.  (*Id*., at p. 8)

261. Minister Farrakhan's speaking the truth undergirds Defendant ADL's false labeling of him.

262. Defendant ADL's false labeling of Minister Farrakhan as "anti-Semitic," coupled with "The U.S. National Strategy to Counter Antisemitism," infringes upon Minister Farrakhan's free exercise of his religion in violation of the First Amendment because it makes him a real and imminent target of this national strategy of the federal government, and, upon information and belief, it is designed to hinder his teaching of Islam as Allah (God) revealed it to the Most Honorable Elijah Muhammad.

263. Upon information and belief, Defendant ADL plans and anticipates that the national strategy will, on one hand, provide the legal justification to officially facilitate the continued infringement upon the free exercise of Minister Farrakhan's religion or, on the other hand, provide the legal justification to facilitate the imminent arrest, prosecution, and likely imprisonment of Minister Farrakhan.

264. On February 9, 2023, prior to the implementation of this national strategy, Defendant ADL's efforts to infringe upon Minister Farrakhan's free exercise of his religion was on full display when Defendant Greenblatt, on behalf of Defendant ADL, wrote a letter to the CEO of Ticketmaster in an attempt to get Ticketmaster to cease selling tickets to the Wintrust Arena where Minister Farrakhan was scheduled to speak. (Exhibit EEE)

265. In said letter, Defendant ADL referred to Minister Farrakhan as, "the Nation of Islam's longtime leader and one of the most notorious antisemites in the country." (*Id*.)

266. Upon information and belief, Defendant ADL sent said letter to the CEO of Ticketmaster to harass, intimidate, and/or to frighten him into withdrawing Ticketmaster's facilitation of the selling of tickets to the Saviours' Day event.

267. Immediately thereafter, on or about February 13, 2023, Defendant Greenblatt, on behalf of Defendant ADL, further attempted to have Minister Farrakhan's Saviours' Day speech cancelled by tweeting, "Louis Farrakhan, the notorious antisemite and hater of LGBTQ+ people, is being given a platform and venue in Chicago. Will the city and owners of this venue condemn his hateful words? Shameful." (Exhibit FFF)

268. While Defendant ADL's efforts to infringe upon Minister Farrakhan's right to free exercise of his religion were not successful, the implementation of Defendant ADL's "National Strategy to Counter Antisemitism" through the White House, Defendant ADL now has the power, might, and weight of the U.S. government to further its efforts to infringe upon Minister Farrakhan's right to free exercise of his religion.

269. Based on these recent acts of Defendant ADL to infringe upon Minister Farrakhan's right to free exercise of his religion prior to the passage of its national strategy, it is foreseeable and reasonably objective to conclude that the threat of imminent harm is real, and that Defendant ADL will not only begin to make additional efforts to infringe upon Minister Farrakhan's right to free exercise of his religion, but it will likely be more successful in accomplishing their continued efforts to infringe upon his First Amendment rights because it now has "The U.S. National Policy to Counter Antisemitism" as additional support from the U.S. government.

Wherefore, Minister Farrakhan respectfully requests this Court find that Defendant ADL violated his First Amendment right to free exercise of religion and grant him the appropriate relief.

## COUNT 3

### FIRST AMENDMENT – FREE EXERCISE OF RELIGION – UNDER COLOR OF FEDERAL LAW

### NATION OF ISLAM V. ADL

270. The Nation of Islam realleges and incorporates by reference paragraphs 20-217, as though fully set forth herein.

271. Defendant ADL, a de facto, quasi-governmental entity, while acting under color of federal law, has impermissibly interfered with, and continues to interfere with, the Nation of Islam's free exercise of religion in violation of the First Amendment of the United States Constitution.

272. Defendant ADL, as part of its "close nexus," "symbiotic relationship," and entwinement with the federal government, conducts investigations on behalf of the F.B.I. on matters it maintains are instances of "antisemitism."

273. In addition to performing investigative functions for the F.B.I., and sharing such information with the F.B.I., Defendant ADL, upon information and belief, also performs enforcement measures regarding these same matters it maintains are instances of "antisemitism."

274. In support of said information and belief, the Nation of Islam once had an account on the streaming video platform named "Vimeo."

275. The Nation of Islam exercised an aspect of its religion by proselytizing through the spreading of the Teachings of the Most Honorable Elijah Muhammad on the "Vimeo" platform.

276. Upon information and belief, Defendant ADL, as part of its relationship with the F.B.I., tracked and investigated the "Vimeo" platform since the Nation of Islam was using it to spread the Teachings of the Most Honorable Elijah Muhammad.

277. Upon information and belief, Defendant ADL determined the messages presented through "Vimeo" were "anti-Semitic," and, thereafter, used its authority and sanctioning by the F.B.I. to cause "Vimeo" to cancel the Nation of Islam's account on or about July 16, 2020. (Exhibit GGG)

278. To this end, "Vimeo" specifically stated in its account cancellation notification to the Nation of Islam that it relied upon information from Defendant ADL to effectuate the cancellation. (*Id.*)

279. Said act unjustly infringed upon the Nation of Islam's free exercise of religion by limiting its ability to express its religion.

Wherefore, the Nation of Islam respectfully requests this Court find that Defendant ADL violated its' First Amendment right to free exercise of religion, and grant it the appropriate relief.

## COUNT 4
### FIRST AMENDMENT – FREE EXERCISE OF RELIGION - §1983
### NATION OF ISLAM V. ADL

280. The Nation of Islam realleges and incorporates by reference paragraphs 20-217, as though fully set forth herein.

281. The First Amendment applies to state and local governments by virtue of the Fourteenth Amendment under the "incorporation doctrine." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

282. 42 U.S.C. §1983 creates a private right of action against any person who, under color of state law, deprives another of "rights, privileges, or immunities secured by the Constitution."

283. Second Circuit Courts, in quoting the U.S. Supreme Court, have noted how the actions of a nominally private entity are reasonably and appropriately attributable to the state: "(1) [when] the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the state,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity has been delegated a public function by the state, ('the public function test')." *Sybalski v. Indep. Grp. Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir. 2008)(quoting *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 296, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001)).

284. Here, the State of New York has provided "significant encouragement" to Defendant ADL, Defendant ADL is a "willful participant in joint activity with the state," and its functions are inextricably "entwined" with certain state policies.

285. On the state level, with respect to being "entwined" with state policies, Defendant ADL not only formulated the national strategy on combating alleged antisemitism, which the State of New York has adopted, it is "entwined" with the state by being, upon information and belief, its partner in the implementation, oversight, and management of its newly adopted policy to "counter antisemitism."

286. With that said, as previously noted, Defendant ADL arbitrarily and capriciously labels Minister Louis Farrakhan as: 1) "virulently antisemitic," (Exhibit III) and 2) "the racist and antisemitic leader of the Nation of Islam," (Exhibit W).

287. Moreover, it has also referred to Minister Farrakhan and the Nation of Islam as, "a leading promoter of antisemitism in America today." (Exhibit JJJ)

288. Defendant ADL has maliciously repeated these false labels against Minister Farrakhan and the Nation of Islam for decades.

289. The gravity of Defendant ADL's aggressive and false labeling of Minister Farrakhan and the Nation of Islam as "virulently antisemitic" and "a leading promoter of antisemitism in America today" has, exponentially, increased considering Defendant ADL's overt and covert entwinement with state and local governments, particularly in the State of New York.

290. In furtherance of this point, on or about September 19, 2023, Governor Kathy Hochul of the State of New York, announced, "comprehensive state action taken to fight antisemitism." (Exhibit JJJ-1)

291. According to the New York governor's official website, "Governor Hochul made the announcement at the Center for Jewish History, making New York State the first state to respond to President Biden's national strategy to counter antisemitism." *Id*.

292. Said "National Strategy to Counter Antisemitism" is the very same national strategy Defendant ADL formulated, developed, and took credit for causing the President of the United States to implement.  (Exhibit BBB)

293. Defendant ADL is the leading, if not the sole, source from which the federal government, and now the State of New York, defines, identifies, and classifies individuals, and entities, as being "anti-Semitic."

294. In her remarks on or about September 19th, the Governor of New York said:

> As Governor of the State with the largest Jewish population outside the State of Israel, I feel a solemn responsibility to protect and uplift New York's vibrant, diverse Jewish communities… No one should have to fear for their safety while going to their place of work, going to school, or just walking the streets. It has always been my top priority to keep the people of New York safe, and we will

continue taking action to fight antisemitism and use every tool at our disposal to eliminate hate and bias from our communities. (Exhibit JJJ-1)

295. The lieutenant governor of the State of New York went on to say, "[w]e are proud to continue that legacy by becoming the first state in the nation to respond to President Biden's national strategy to combat antisemitism and root out hate." *Id*.

296. The governor's declaration that the State of New York, "will continue taking action to fight antisemitism and use every tool at our disposal to eliminate hate and bias…" and the lieutenant governor's statement that the state is responding to, "President Biden's national strategy to combat antisemitism and root out hate," become the predicate for the real and imminent threat of specific harm to, and infringement upon, the Nation of Islam's First Amendment right to free exercise of its religion precisely because Defendant ADL considers the Nation of Islam "a leading promoter of antisemitism in America today."

297. The scope, breadth, and depth of the governor's actions to "use every tool at [its] disposal to <u>eliminate</u> hate and bias," (emphasis added) which, upon information and belief, includes Defendant ADL, is vast and comprehensive, to say the least.

298. Upon information and belief, Defendant ADL will be the primary agent used by the State of New York, to coordinate, implement, and oversee state departments and agencies in furtherance of their implementation of Defendant ADL's national strategy to combat "antisemitism."

299. Said departments and agencies include, but are not limited to:

    a.  The New York State Division of Homeland Security and Emergency Services announced that "nearly $38 million will be distributed to nonprofit organizations throughout the state facing an increased risk of terrorism and violent extremist attacks." *Id*.

b. The New York State Anti-Hate in Education Center that will, among other things, "combat hate…and focus on eliminating antisemitism," *Id*. and

c. The New York State Division of Human Rights that, upon information and belief, will use Defendant ADL to perform the state function of improving its "hate and bias incident data collection," *Id*., which Defendant ADL is considered by the governor of the State of New York to be an expert at.

300. Thus, upon information and belief, Defendant ADL's functions on behalf of the State of New York are inextricably "entwined" with implementing the State of New York's policy to "eliminate" and "root out," what Defendant ADL identifies and declares to be "antisemitism" and "hate."

301. Most revealing with respect to Defendant ADL acting "under color of state law" is its entwinement with, and willful participation in, joint activity with the New York State Police.

302. According to the governor of the State of New York's official website, "…the New York State Police will re-launch law enforcement focused Hate Crime Investigative Seminars." *Id*.

303. Apparently, these seminars previously existed in the New York State Police Department because the governor's website indicates there will be a "re-launch" of such seminars.

304. The governor's website goes on to state, "New York State Police are working with the New York State Division of Criminal Justice Services to launch a new series of Hate Crime Investigative Seminars. Previous seminars included presentations from the U.S. Attorney's Office for the Northern District, the F.B.I., and the Anti-Defamation League." (Emphasis added) *Id*.

305. Interestingly, the U.S. Attorney's Office and the F.B.I. are branches of the Justice Department of the United States government and are authorized to conduct hate crime investigations, including surveillance.

306. Since Defendant ADL was also a past presenter to the New York State Police, then, upon information and belief, it, too, is not only skilled enough in the state function of conducting investigations into purported hate crimes, but it is authorized by the federal government, and the State of New York, to perform the government function of conducting criminal investigations into purported hate crimes such that it was qualified to train the New York State Police in conducting such investigations.

307. Upon information and belief, Defendant ADL, in its presentations to the New York State Police, has specifically mentioned Minister Farrakhan and the Nation of Islam as leading espousers of "antisemitism."

308. Said actions entwined with the New York State Police have an immediate, imminent, and real threat of not only infringing upon the Nation of Islam's First Amendment right to free exercise of its religion, but also contains the real threat of loss of liberty for those Defendant ADL have categorically and unwaveringly determined to be "virulently antisemitic" and espousers of "hate."

309. This real threat of loss of liberty for the recipients of Defendant ADL's categorical declarations is palpable and imminent particularly when considering the press statement the New York State Attorney General Letitia James issued on October 12, 2023, regarding a "warning against antisemitism[.]" (Exhibit JJJ-2)

310. In said press statement, the attorney general stated, "[l]et me be clear: New York has zero tolerance for hate of any kind, not now and not ever. As we mourn the loss of innocent

Israeli and Palestinian lives, there is no excuse or tolerance for antisemitism, Islamophobia, or bigotry and discrimination of any kind." *Id.*

311. Defendant ADL's current actions of conducting the governmental function of training New York State Police officers in investigating acts and instances of "antisemitism" produces a real and imminent threat that Minister Farrakhan and the Nation of Islam will migrate to becoming the open target of the State of New York's "zero tolerance [policy] for hate."

312. This real and imminent threat of a specific harm as a result of Defendant ADL's performing the government function of investigating what it determines to be instances of "antisemitism" and "hate" crimes is not vacuous when considering the State of New York's Attorney General's website states of the attorney general's scope of authority, "[w]hile the Attorney General acts independently of the Governor, the Governor or a state agency may request the Attorney General to undertake specific criminal investigations and prosecutions." (Exhibit JJJ-3)

313. Thus, the governor of New York's adoption of the White House's "National Strategy to Counter Antisemitism," which Defendant ADL was the architect and facilitator of, has a reasonable likelihood of infringing upon the Nation of Islam's free exercise of its religion considering Defendant ADL, upon information and belief, performs a critical function for, and on behalf of, the State of New York in investigating what it determines to be instances of "antisemitism" and "hate."

314. In addition to the state level, Defendant ADL's actions "under color of state law" present a real and immediate threat to the Nation of Islam's free exercise of its religion from the city level as well.

315. To this end, on November 21, 2022, during a press conference in the City of New York, and in a response to a question regarding New York's efforts to combat "antisemitism," New York Mayor Eric Adams said:

> [Dealing] with specifically antisemitism is not just a law enforcement issue. We need to stop the feeders of antisemitism. That is why we've partnered with the ADL and other organizations…to say, "How do we create environments where hate cannot grow in our cities?" We're doing it in the Department of Education, we're doing it in collaborations with some of the organizations that are mentioned here with partnership — Rabbi, the Board of Rabbis, Rabbis Potasnik and others. We know we have to stop the feeder of hate in our cities, in all the different groups in this city. And then we must have a real law enforcement response. The commissioner immediately put new leadership over at the Hate Crime Unit because we wanted to be clear that if there are those who are using hate to target people in the city, we want those cases investigated, we want the people apprehended, and we want to make sure that they're prosecuted to the full extent of the law.  (Exhibit HHH)

316. Since Defendant ADL has falsely labeled the Nation of Islam as a body of "anti-Semitic" people, it is axiomatic to say that the Nation of Islam is a target of the City of New York's "partnership with the ADL."

317. The City of New York's partnership with Defendant ADL will serve to infringe upon the free exercise of religion of the peaceful, law-abiding members of the Nation of Islam.

318. This partnership to address the "feeders of antisemitism" will invariably lead to the harassment, economic reprisals, and likely arrest and prosecution of members of the Nation of Islam because Mayor Adams said the City of New York's response to "the feeders of antisemitism" includes "a real law enforcement response."

319. Defendant ADL's entwinement and joint activity with the law enforcement department of the City of New York creates a real and imminent risk of surveillance, targeting, and unlawful arrest of members of the Nation of Islam in name of the City of New York fulfilling its stated objectives to combat "feeders of antisemitism."

320. It is against the backdrop of these rapidly evolving regulatory policies of "eliminating hate" and "combating antisemitism" adopted by the State and City of New York that causes the investigatory actions of Defendant ADL on behalf of, and in junction with, the State and City of New York to result in a real and imminent threat of harassment, targeting, and likely criminal prosecution of members of the Nation of Islam's in violation of the First Amendment right to free exercise of their religion.

321. Further to this point, part of the registered members of the Nation of Islam's exercise of their religion includes wearing unique and readily identifiable garments.

322. The male members, at times, wear either: 1) a distinct uniform with a red star and crescent emblem affixed to the shoulders of the uniform, 2) a suit and bowtie, or 3) a suit and straight tie with a Nation of Islam lapel pin.

323. The female members, at times, wear distinctively made, long garments with either a head scarf, or what is called a "headpiece," which is a more formal version of the head scarf.

324. The actions of Defendant ADL, while acting "under color of state law," has the real and reasonable likelihood of chilling the Nation of Islam's members' desire to exercise their religion by wearing their readily identifiable religious garments, because of Defendant ADL's relentless and false labeling of Minister Farrakhan and the Nation of Islam as "anti-Semitic."

325. Said label, albeit false, justifies Defendant ADL's performing of the state governmental function of investigating what and who it determines to be "anti-Semitic."

326. The readily identifiable dress of the members of the Nation of Islam makes them an open target for Defendant ADL's surveillance and investigation as it has historically and, admittedly, conducted such investigations as early as the 1940s.

327. Upon information and belief, the intel gathered by Defendant ADL is shared with the New York State Police, the New York Division of Homeland Security, and the New York Attorney General's office for possible criminal prosecution.

328. Upon information and belief, Defendant ADL's performing the state function of surveilling and investigating what it determines to be the "virulently antisemitic" Nation of Islam is done, in part, by its ability to identify it members by their dress.

329. The real and imminent threat of harassment, prosecution, and likely loss of liberty because of being a member of the Nation of Islam has the real and imminent likelihood of causing members to no longer express their religious beliefs by wearing unique religious garments.

330. In addition, part of the proselytizing of the religion of Islam, as taught by the Most Honorable Elijah Muhammad, is the selling of a religious-based newspaper once known as *Muhammad Speaks*, now known as *The Final Call*.

331. Every newspaper contains words from the Most Honorable Elijah Muhammad and the Honorable Minister Louis Farrakhan, which are designed to further Their Mission of delivering the Truth taught by Master Fard Muhammad that will correct the condition of the spiritual, mental, and moral death of the Black man and woman of America, and, eventually, the whole of humanity.

332. Mainly the registered men, but occasionally the registered women accompany the men while going door-to-door offering *The Final Call* newspaper to the community.

333. In addition, many registered men sell *The Final Call* to members of their community on public streets.

334. The Nation of Islam's right to free exercise of religion has a real and imminent threat of not only being infringed upon, but likely being eviscerated, by Defendant ADL's actions

of surveilling, investigating, and sharing with New York state law enforcement agencies what it identifies as evidence of "antisemitism" and "hate."

335. The results of their investigations will likely lead to imminent criminal prosecution and said actions will have a reasonable chilling effect on the members of the Nation of Islam's desire to exercise their religion by selling *The Final Call* newspaper in the public.

336. Said state-sanctioned investigatory actions by Defendant ADL establishes the "close nexus" and "entwinement" between it and the State of New York and the City of New York, such that said actions are fairly attributable to the State of New York, thereby making Defendant ADL a state actor for purposes of 42 U.S.C. §1983.

Wherefore, Nation of Islam respectfully requests this Court find Defendant ADL's actions violate its First Amendment right to free exercise of religion and grant it the appropriate relief.

## COUNT 5
### FIRST AMENDMENT – FREEDOM OF ASSOCIATION - §1983
### NATION OF ISLAM V. ADL

337. The Nation of Islam realleges and incorporates by reference paragraphs 20-217 and paragraphs 278-332, as though fully set forth herein.

338. Upon information and belief, Defendant ADL, in conjunction with New York law enforcement officials, have engaged in activity that infringes upon the Nation of Islam's First Amendment right to freedom of association and, thereby, violated 42 U.S.C. §1983.

339. To this end, as previously noted, on November 21, 2022, during a press conference in the City of New York, and in a response to a question regarding New York's efforts to combat "antisemitism," Mayor Eric Adams said:

"[Dealing] with specifically antisemitism is not just a law enforcement issue.   We need to stop the feeders of antisemitism. That is why we've partnered with the ADL and other organizations…to say, 'How do we create environments where hate cannot grow in our cities?' We're doing it in the Department of Education, we're doing it in collaborations with some of the organizations that are mentioned here with partnership — Rabbi, the Board of Rabbis, Rabbis Potasnik and others. We know we have to stop the feeder of hate in our cities, in all the different groups in this city. And then we must have a real law enforcement response. The commissioner immediately put new leadership over at the Hate Crime Unit because we wanted to be clear that if there are those who are using hate to target people in the city, we want those cases investigated, we want the people apprehended, and we want to make sure that they're prosecuted to the full extent of the law.  (Exhibit HHH)

340. Since Defendant ADL has falsely labeled the Nation of Islam as a body of "anti-Semitic" people, it is axiomatic to say that the Nation of Islam is a target of the City of New York since it has "partnered with the ADL."

341. This partnership to address the "feeders of antisemitism" will invariably lead to the harassment, economic reprisals, and likely arrest and prosecution of members of the Nation of Islam because Mayor Adams said the City of New York's response to "the feeders of antisemitism" includes "a real law enforcement response."

342. The City of New York's partnership with Defendant ADL will serve to hinder the Nation of Islam's First Amendment right of freedom of association because said false labeling of the Nation of Islam as "anti-Semitic" by Defendant ADL has a real and immediate chilling effect on anyone desiring to attend mosque meetings, or to otherwise associate with the Nation of Islam.

343. Defendant ADL's coordination with the law enforcement department of the City of New York creates a real and imminent risk of harm, and unlawful intrusion and surveillance at the hands of law enforcement in the City's stated rationale to combat "antisemitism."

344. Said state-sanctioned investigatory actions by Defendant ADL establishes the "close nexus" and "entwinement" between it and the State of New York such that said actions are fairly attributable to the State of New York and the City of New York, thereby making Defendant ADL a state actor for purposes of 42 U.S.C. §1983.

Wherefore, Nation of Islam respectfully requests this Court find Defendant ADL's actions violate its First Amendment right to free exercise of religion and grant it the appropriate relief.

**COUNT 6**

**DEFAMATION *PER SE* (TRADE/BUSINESS/MISSION/CALLING)**

**FARRAKHAN V. ADL**

345. Minister Farrakhan realleges and incorporates by reference paragraphs 20-217, as though fully set forth herein.

346. The elements of a cause of action sounding in defamation *per se* are: 1) a defamatory statement of fact concerning the plaintiff, 2) publication to a third party, 3) fault (either negligence or actual malice depending on the status of the defamed person, 4) falsity of the defamatory statement, and 5) *per se* actionability.

347. One useful general rule is that a defamatory statement which tends to disparage a person in the way of his office, profession, or trade is defamatory *per se* and does not require proof of special damages. *Liberman v. Gelstein*, 80 NY2nd 429 (1992).

348. On or about October 20, 2022, on its official website, Defendant ADL published to the world an article entitled, "Extremists Are Praising Kanye West's Antisemitism, Parlor Acquisition," wherein it falsely labeled Minister Farrakhan as "virulently antisemitic." (Exhibit III)

349. In said article, Defendant ADL did not disclose any facts to the reader of the online post to accompany the false statement that Minister Farrakhan is "virulently antisemitic."

350. A reader of that online post could reasonably infer that Defendant ADL relied on certain facts that were unknown and unstated to the reader that supported said false statement that Minister Farrakhan is "virulently antisemitic."

351. Additionally, on February 9, 2023, Defendant ADL, by way of its CEO, Defendant Greenblatt, published to the world on its official website a letter to the CEO of Ticketmaster regarding Minister Farrakhan's upcoming 2023 Saviours' Day address.

352. In said letter, Defendant ADL falsely stated to the CEO of Ticketmaster that a past instance of antisemitism was, "Farrakhan referring to Jews as 'termites.'" *Id*.

353. This was a false statement of fact because at no point has Minister Farrakhan ever said, "Jews are termites."

354. Thus, Defendant ADL's defamatory statements constitute clear and convincing evidence of actual malice because it knew said statements were false and/or were made with reckless disregard as to their falsity.

355. Defendant ADL knowingly, willfully, and intentionally published said false statements to the world on its official website without privilege or authorization.

356. Defendant ADL maliciously spewed these false statements for the purpose of generating hatred, contempt, aversion, and to induce an evil and unsavory opinion of Minister Farrakhan in the minds of a substantial number of people.

357. Minister Farrakhan publicly acknowledged that fact in a May 7, 2007, CNN interview with Don Lemon, wherein he said, in part:

> I've never been an anti-Semite from the depth of my heart. I know that I've never hated the Jewish people. And for me to hate a Jewish person because of their faith

tradition would make me less than a Muslim, less than a righteous person, and would make me a bigot, and a wicked person.

358. Thus, every time Defendant ADL falsely labeled, and continues to falsely label, Minister Farrakhan as an "anti-Semite," it has the effect of causing countless people to look at Minister Farrakhan with opprobrium and as "less than a Muslim[.]"

359. These statements have injured Minister Farrakhan in his status as a Minister and Anointed Servant of Allah (God), because they have caused people, organizations, and/or institutions to shun, disinvite, and falsely disparage him.

360. The defamatory *per se* statements of falsely charging Minister Farrakhan with "anti-Semitism" and being an "anti-Semite," most importantly hinders his full ability to "deliver the message" of Allah (God), that he is commissioned and commanded to deliver to his people and to all of humanity.

361. Minister Farrakhan has experienced, and continues to experience the loss of standing in certain communities, the loss of public esteem, and receipt of public disparagement because of these defamatory statements.

362. Said false statement by Defendant ADL was uttered with malice and constituted defamation *per se* because Minister Farrakhan is a world renown religious leader with a Mission and calling to represent the faith of Islam, in general, and the Most Honorable Elijah Muhammad and His Teachings, in particular, and to be labeled as one who denigrates the faith of another human being simply because of his or her faith, instantly damages his 68-year standing as a religious / faith leader.

363. Being falsely called an "anti-Semite" is incompatible with his calling as a Man of Faith.

364. Moreover, Defendant ADL's false statement attributed to Minister Farrakhan that he referred to "Jews as termites" is also incompatible with his calling as a man of Faith.

Wherefore, Minister Farrakhan respectfully requests this Court find that Defendant ADL's false statements constituted defamation *per se* and grant him the appropriate relief.

## COUNT 7

### DEFAMATION *PER SE* (TRADE/BUSINESS/MISSION/CALLING)

### FARRAKHAN V. GREENBLATT

365. Minister Farrakhan realleges and incorporates by reference paragraphs 20-217, as though fully set forth herein.

366. On February 9, 2023, Defendant Greenblatt published to the world on Defendant ADL's official website a letter he sent to the CEO of Ticketmaster regarding Minister Farrakhan's then-upcoming 2023 Saviours' Day address. (Exhibit EEE)

367. Referring to the Nation of Islam's annual religious observance, Defendant Greenblatt said, in part, "[t]he event is set to be held at the Wintrust Arena in Chicago and headlined by Louis Farrakhan, the Nation of Islam's longtime leader and one of the most notorious antisemites in the country." *Id*.

368. Additionally, in said letter, Defendant Greenblatt falsely stated to the CEO of Ticketmaster that a past instance of antisemitism was, "Farrakhan referring to Jews as 'termites.'" Id.

369. This was a false statement of fact because at no point has Minister Farrakhan ever said, "Jews are termites."

370. Upon information and belief, Defendant Greenblatt either monitors and/or receives reports on practically every word Minister Farrakhan speaks; therefore, he knew, or should have known, that Minister Farrakhan did not make those statements he attributed to Minister Farrakhan and published to the world.

371. Thus, Defendant Greenblatt's defamatory statements constitute clear and convincing evidence of actual malice because he knew said statements were false and/or were made with reckless disregard as to their falsity.

372. Defendant Greenblatt spewed these false statements for the purpose of generating hatred, contempt, aversion, and to induce an evil and unsavory opinion of Minister Farrakhan in the minds of a substantial number of people.

373. Defendant Greenblatt knowingly, willfully, and intentionally published said false statements to the world on Defendant ADL's official website without privilege or authorization.

374. Said false statement by Defendant Greenblatt uttered with malice constituted defamation *per se* because  Minister Farrakhan's standing as religious leader.

375. To this point, Minister Farrakhan is a world renown religious leader with a mission and calling to represent the faith of Islam, in general, and the Most Honorable Elijah Muhammad and His Teachings, in particular, and to be falsely labeled as one who denigrates the faith of another human being simply because of his or her faith, instantly damages his 68-year standing as a religious / faith leader.

376. Being falsely called an "anti-Semite" is incompatible with his calling as a man of Faith.

377. Moreover, Defendant ADL's false statement attributed to Minister Farrakhan that he referred to "Jews as termites" is also incompatible with his calling as a man of Faith.

Wherefore, Minister Farrakhan respectfully requests this Court find that Defendant Greenblatt's statements constituted defamation *per se* and grant him the appropriate relief.

## COUNT 8

### DEFAMATION *PER SE* (TRADE/BUSINESS/MISSION/CALLING)

### FARRAKHAN V. SWC

378. Minister Farrakhan realleges and incorporates by reference paragraphs 20-217, as though fully set forth herein.

379. On March 1, 2023, Defendant SWC published on its official website an article entitled, "SWC: Farrakhan's Annual Savior's [Sic] Day Anti-Jewish Tirades Continue As Does Silence of Political and Faith Leaders."  (Exhibit TT)

380. In said article, SWC made the false factual statement that in his 2023 Saviours' Day address, "Farrakhan invoked the New Testament's 'Synagogue of Satan,' to demonize Judaism and those who revere the Torah." *Id*.

381. Minister Farrakhan never invoked the New Testament's reference to the "Synagogue of Satan" to "demonize Judaism and those who revere the Torah."

382. In the same article, Defendant SWC admitted that it has "tracked… [Minister] Farrakhan and his trail of Jew hatred and antisemitic incitement for four decades."  *Id*.

383. Defendant SWC, in tracking Minister Farrakhan "for four decades" knew, or should have known, that Minister Farrakhan does not "demonize" the legitimacy of Judaism because in its monitoring, it would have heard Minister Farrakhan make public statements that express admiration and respect for Judaism and its legitimacy with Islam and Christianity as one of the "three great revealed religions."

384. Thus, Defendant SWC made such defamatory statements with actual malice because it made them with knowledge of their falsity and/or with a reckless disregard for their falsity.

385. Defendant SWC spewed the false statements with actual malice for the purpose of generating hatred, contempt, aversion, and to induce an evil and unsavory opinion of Minister Farrakhan in the minds of a substantial number of people.

386. Defendant SWC knowingly, willfully, and intentionally published said false statements to the world on its official website without privilege or authorization.

387. Being falsely called an "anti-Semite" is incompatible with his calling as a Man of Faith.

388. Additionally, being falsely accused of using the Bible's reference to the "Synagogue of Satan" to "demonize Judaism" is also incompatible with his calling as a Man of Faith.

Wherefore, Minister Farrakhan respectfully requests this Court find that Defendant SWC's statements constituted defamation *per se* and grant him the appropriate relief.

## COUNT 9
### DEFAMATION *PER SE* (TRADE/BUSINESS/MISSION/CALLING)
### FARRAKHAN V. COOPER

389. Minister Farrakhan realleges and incorporates by reference paragraphs 20-217, as though fully set forth herein.

390. As previously noted, on March 1, 2023, Defendant Cooper, on SWC's official website, made false and defamatory statements about Minister Farrakhan when he said, "[w]e have tracked and denounced Farrakhan and his trail of Jew-hatred and antisemitic incitement for four decades."  (Exhibit TT)

391. Said mischaracterization is exacerbated by Defendant Cooper's history of repeatedly mischaracterizing and falsely labeling Minister Farrakhan in the same or substantially similar defamatory manner.

392. Upon information and belief, Defendant Cooper either monitors, or receives reports on, practically every word Minister Farrakhan speaks, therefore, he knew, or should have known, that Minister Farrakhan does not deny the legitimacy of Judaism because in his monitoring, he would have heard Minister Farrakhan make public statements that express admiration and respect for Judaism and its legitimacy right alongside Islam and Christianity as one of the "three great revealed religions."

393. Thus, Defendant Cooper made such defamatory statements with actual malice and with knowledge of their falsity and/or with a reckless disregard for their falsity.

394. Defendant Cooper spewed these false statements for the purpose of generating hatred, contempt, aversion, and to induce an evil and unsavory opinion of Minister Farrakhan in the minds of a substantial number of people.

395. Defendant Cooper knowingly, willfully, and intentionally published said false statements to the world on the SWC's official website without privilege or authorization.

396. Said false statement by Defendant Cooper constituted defamation *per se* because Minister Farrakhan is a world renown religious leader with a mission and calling to represent the faith of Islam, in general, and the Most Honorable Elijah Muhammad and His Teachings, in particular, and to be labeled as one who denigrates the faith of another human being simply because of his or her faith, instantly damages his 68-year standing as a religious / faith leader.

397. Being falsely called an antisemite is incompatible with his calling as a man of Faith.

Wherefore, Minister Farrakhan respectfully requests this Court find that Defendant Cooper's statements constituted defamation *per se* and grant him the appropriate relief.

**C**OUNT **10**

**D**E **F**ACTO **D**EFAMATION *P*ER *S*E

**F**ARRAKHAN V. **A**LL **D**EFENDANTS

398. Minister Farrakhan realleges and incorporates by reference paragraphs 20-217, as though fully set forth herein.

399. Under New York law, four categories of statements constitute defamation *per se*: 1) those that accuse the plaintiff of a serious crime; 2) those that 'tend to injure another in his or her trade, business, or profession, 3) those that accuse the plaintiff of having a loathsome disease, and 4) those that impute unchastity to a woman. (*Liberman*, 80 N.Y.2d 435)

400. De facto defamation *per se* is not limited to these four categories.

401. Whether a statement is defamatory *per se* depends upon, among other factors, the temper of the times, or the current of contemporary public opinion, with the understanding that words, harmless in one era, may be highly damaging to reputation at another time or in a different place.

402. Whether a statement is defamatory *per se* can evolve from one generation to the next.

403. In today's times, the false labeling of being an "anti-Semite," and/or any of its variations and/or derivatives, is a statement that is so odious and damaging that sometimes seismic social and economic consequences immediately follow after Defendants ADL and SWC attaches said label to someone, whether it was applied appropriately or not.

404. For instance:

    a.  Kyrie Irving, a star basketball player, suffered socially and economically simply for reposting a link to a documentary Defendant ADL determined to be "anti-Semitic," (Exhibit KKK) and being labeled "anti-Semitic" by Defendant ADL resulted in a very public demand for Mr. Irving to:

     i.   make a public apology for being "anti-Semitic,"

    ii.   make a $500,000 donation to anti-hate causes,

   iii.   complete sensitivity training with an organization approved by Defendant ADL,

   iv.   complete "antisemitism" training,

    v.   meet with Defendant ADL, and other Jewish leaders, to discuss his alleged "anti-Semitic" posting of the documentary link,

   vi.   pay an additional fine to his sport's league, and

  vii.   meet with the owner of his sport's team to demonstrate his understanding of his alleged "anti-Semitic" activity of posting the documentary link, which Mr. Irving repeatedly denied was "anti-Semitic."  Said false label resulted in economic damages in the amount of $11 million when Nike cancelled his shoe contract.

b.   Actor Jamie Foxx, recently posted on Instagram, "They killed Jesus, What do you think they'll do to you #fakefriends, #fakelove." Mr. Foxx was immediately, and publicly, labeled "anti-Semitic" and forced to apologize.  Mr. Foxx earnestly tried to explain that he was not referring to Jewish or Semitic people, but really referring to an interchange between him and a fake friend.  Nevertheless, Jamie Foxx was forced to publicly apologize, and his public apology was carried by dozens of international media agencies, including: NBC, CNN, *The Guardian, USA Today, Entertainment Weekly, Billboard, Forbes, The Washington Post, The Los Angeles Times, Variety, People Magazine, The Times of Israel, The Hollywood Report*, signaling to the world that superstar Jamie Foxx is this horrible "anti-Semite."

  c. DeSean Jackson, a star football player, after being labeled "anti-Semitic," suffered socially and economically simply for posting a favorable statement about Minister Farrakhan, and him being labeled "anti-Semitic" placed his career in jeopardy, and resulted in him being penalized by the Philadelphia Eagles. (Exhibit CC)

  d. Dwight Howard, a retired star basketball player, after being labeled "anti-Semitic," suffered socially and economically simply for posting a statement in support of the Palestinian people, (Exhibit LLL)

  e. Marc Lamont Hill, a former CNN political commentator, was discharged from CNN after being labeled "anti-Semitic" because he made statements in support of the deplorable plight of the Palestinian people under decades of oppressive rule of leadership in the state called Israel. (Exhibit MMM)

405. Upon information and belief, none of these individuals expressed any hatred toward Judaism or advocated violence against Jewish people.

406. Their "high crime and misdemeanor" was to say something Defendants ADL and SWC did not like or did not comport with their interests.

407. Persons labeled anti-Semitic are negatively discussed in U.S. government hearings, shunned by people of goodwill, stifled in their businesses, and viewed, in general, as repulsive people worthy of other's hatred, disgust, castigation, and contempt.

408. A person who is falsely labeled as being "anti-Semitic" suffers immediate injury to his or her reputation, which, at times, is coupled with profound economic sanctions, such as the loss of employment, loss of business contracts, and loss of economic opportunities.

409. The threat of economic injury as a result of being labeled "anti-Semitic" has grown exponentially since the implementation of "The U.S. National Strategy to Counter Antisemitism" because said individuals will suffer the reprisal of the federal government.

410. Since the terms "anti-Semite," "anti-Semitic," and "antisemitism" engenders the same degree of shame, obloquy, contumely, opprobrium, odium, contempt, ridicule, aversion, ostracism, degradation, and/or disgrace as statements accusing someone of serious criminal conduct, impugning a person in his or her trade or profession, implying that a person has a "loathsome disease," or imputing unchastity to a woman, then the false use of that term should be declared to be a category of de facto defamation *per se*.

411. The swift retribution that results from being falsely labeled "anti-Semitic" is on par with, if not greater than, being falsely accused of one of the four categories that currently constitute de facto defamation *per se* under New York caselaw.

412. The operative word in this request for consideration is the "false" use of the word "anti-Semite," or some variation and/or derivative of the word, particularly in present times precisely because of the immediate, unequivocal, and practically unavoidable social, political, and economic backlash that ensues from being so labeled.

413. This undeniable backlash and punitive economic sanctions that accompanies this label when it is falsely ascribed to a person or group has gotten progressively worse such that the use of the word as a false label should be declared to be defamation *per se*.

Wherefore, Minister Farrakhan respectfully requests this Court find the "false" use of the word "anti-Semite," and/or any of its variations and/or derivatives be declared added to the list of de facto defamation *per se* categories.

### COUNT 11

#### DECLARATORY JUDGMENT

#### THE ADL IS A QUASI-GOVERNMENTAL ENTITY

414. Minister Farrakhan realleges and incorporates by reference paragraphs 20-217 and paragraphs 244-260, as though fully stated herein.

415. Based on "The ADL: In Its Own Words," along with its actions, it is reasonable and justified to declare it as a quasi-governmental entity of the federal government.

**Justification #1 – Close Nexus and Symbiotic Relationship with the F.B.I.**

416. The U.S. Justice Department is commissioned with, among other things, investigating major domestic crimes, including surveillance and data gathering of potential hate crimes.

417. The department primarily responsible for such governmental investigations is the F.B.I.

418. According to its website:

> The FBI's investigative philosophy emphasizes close relations and information sharing with other federal, state, local, and international law enforcement and intelligence agencies. A significant number of FBI investigations are conducted in concert with other law enforcement agencies or as part of joint task forces. (Exhibit DD-4)

419. Since the F.B.I. "emphasizes close relations and information sharing with other federal, state, local, and international law enforcement and intelligence agencies," then any entity the F.B.I. maintains "close relations" with would be reasonably identified as a "federal, state, local, [or] international law enforcement and intelligence agenc[y]."

420. The plain reading of the F.B.I.'s statement is consequential in identifying Defendant ADL as a quasi-governmental entity because of its "close relations" with the F.B.I.

421. Multiple past and current F.B.I. directors have openly spoken about and emphasized Defendant ADL's "close nexus" to and "symbiotic relationship" with the department.

422. As noted, *supra*:

    a.  Former F.B.I. Director J. Edgar Hoover, directed his field agents, "to immediately make certain that [they] have established liaison with the head of the antidefamation league regional office in [their] territory and explain the jurisdiction and interest of this bureau," (Exhibit I)

    b.  Former F.B.I. Director Comey said, wrote "A Love Letter to the ADL," wherein he recognized Defendant ADL as, "[a]n organization that works with us to fight hate crime and terrorism [and] to educate law enforcement," (Exhibit I-1), and

    c.  Current F.B.I. Director Wray said to Defendant ADL, "…I want to thank the ADL today for your support in conducting the training that all of our new special agents and intelligence analysts participate in…." (Exhibit I-2)

423. These admissions by former and current F.B.I. directors of "close relations" between the F.B.I. and Defendant ADL soundly establishes Defendant ADL as quasi-governmental.

424. Moreover, Defendant Greenblatt confirmed Defendant ADL's "close relations" with the F.B.I. on February 4, 2021, when he unequivocally said during a congressional hearing that, "…we at the ADL work closely with the F.B.I…." (Exhibit DD-3)

425. Defendant Greenblatt's admission on the congressional record further establishes a "close nexus" and "symbiotic relationship" between Defendant ADL and the F.B.I. such that it can only be reasonably considered as a full-on quasi-governmental actor.

**Justification #2 – Information Sharing Between it and the F.B.I.**

426. Further justification for identifying Defendant ADL as a quasi-government actor is because of its history of two-way "information sharing" between it and the F.B.I.

427. As noted on its website, the F.B.I. "emphasizes…information sharing with other federal, state, local, and international law enforcement and intelligence agencies."

428. Since the F.B.I. shares information "with other federal, state, local, and international law enforcement and intelligence agencies," and since it shares information with Defendant ADL, then it is reasonable to conclude that Defendant ADL is viewed by this branch of the U.S. federal government as a "federal, state, local, [or] international law enforcement and intelligence agenc[y]."

429. The free sharing of information between Defendant ADL and the F.B.I. makes Defendant ADL a "willful participant in joint activity" with the federal government and, thus, warrants it being declared to be a quasi-governmental actor. (Exhibit DD-5)

**Justification #3 – "Entwinement" with the Federal Government**

430. An illustration of Defendant ADL functioning as a quasi-governmental entity occurred in conjunction with the May 2, 2023, White House briefing on "antisemitism."

431. On said date, Defendant ADL, by way of Defendant Greenblatt, established its "entwinement" with the federal government when he apparently exercised the authority bestowed upon him as the CEO of Defendant ADL to solicit the presence of an official from the Department of Homeland Security to make a presentation at that White House briefing on combating "antisemitism."

432. Evidence of Defendant ADL's ability and capacity to summon speakers to an Executive Branch briefing occurred when Homeland Security Advisor Dr. Liz Sherwood-Randall stated in her opening remarks to President Biden and his team:

> Good morning. It's my honor to be here with each of you today.  When Jonathan asked if I would give keynote remarks at this gathering, I eagerly agreed because

of the vital mission of this organization, the partnership that we have built in the Biden Administration, and the urgent issues facing our community. (Exhibit DD-2)

433. Her opening remarks identifying the CEO of Defendant ADL as the reason why she was present at a briefing with the president of the United States not only solidified Defendant ADL as being entwined with the federal government, but she also disclosed that Defendant ADL even has a "partnership" with the Department of Homeland Security.

434. Additionally, further into her remarks, Dr. Sherwood-Randall expressed how much the Department of Homeland Security "need[s]" Defendant ADL when she stated, in part:

> … we need the Anti-Defamation League. And we will continue to work alongside you. Because whether it's the ADL's COMBAT plan to fight antisemitism in our communities… your REPAIR plan to address online hate… or many of the other remarkable initiatives you have underway…. we share the ADL's comprehensive approach to end the defamation of the Jewish people…. (*Id.*)

435. The moment the Homeland Security Advisor to the U.S. government says the Department of Homeland Security "need[s the Anti-Defamation League" to perform its function of protecting the U.S. against terrorist and other criminal organizations that threaten the country's safety and national security, and that it "work[s] alongside" Defendant ADL, then it is incontrovertibly established that Defendant ADL: 1) is a "willful participant in joint activity" with the federal government (hereinafter, "government") 2) is "entwined" with the government, 3) has a "close nexus" with the government, 4) performs "a public function" for the government, and 5) is in a "symbiotic relationship" with the government.

## Justification #4 – Drafting, Shaping, and Implementing a National Policy

436. To say Defendant ADL was instrumental in facilitating "The U.S. National Strategy on Countering Antisemitism" would be an understatement; in fact, it was the visionary, architect, builder, and promoter of said federal national strategy.

437. Defendant Greenblatt gave a hint that Defendant ADL intended to work with its partners in the federal government to create and implement this national strategy when he said during his February 4, 2021, congressional remarks regarding combating "antisemitism" that he believed the F.B.I. "…is focused on the problem, but we do not yet have a whole-of-government approach." (DD-3)

438. That "whole-of-government approach" is what came to life on May 25, 2023, when President Biden signed that national policy in effect.

439. In fact, his reference to "a whole-of-government approach" is practically a mirror-image of the language found throughout "The U.S. National Strategy to Counter Antisemitism," wherein it references "a whole-of-society approach." (Exhibit BBB)

440. This practically mirror-imaged language from Defendant Greenblatt on February 4, 2021, and the language found in the national strategy released on May 25, 2023, establishes how Defendant ADL successfully pulled the proverbial levers of the U.S. government to implement its plan, which it intends to use in conjunction with its "close relations" with the F.B.I. to "combat" anyone and any group it determines to be "anti-Semitic."

441. Additionally, the U.S. government appropriations identified below and "The U.S. National Strategy to Counter Antisemitism," drafted by Defendant ADL, are the products of Defendant Greenblatt's request for "a whole-of-government approach" because said national strategy directs the following government agencies to act on said national policy:

    a.  The US Congress,

    b.  The Department of Commerce,

    c.  The Department of Homeland Security,

    d.  The Department of Justice,

    e.   The Department of Education,

    f.   The Department of Housing and Urban Development,

    g.   The Department of Agriculture,

    h.   The Department of Health and Human Services,

    i.   The Department of Defense, and

    j.   The Department of Veterans Affairs. (Exhibit BBB)

## **Justification #5 – Solicited Funds Directly from the OMB**

442. Another clear and convincing illustration of Defendant ADL's functioning as a quasi-governmental entity is its remarks regarding the need to be financially supported by the federal government and then its ability to make a direct solicitation of funds to the OMB.

443. In those same congressional remarks on February 4, 2021, Defendant Greenblatt, on behalf of Defendant ADL, stated:

> We do not yet have adequate resources. The Biden administration has given us some very encouraging signals and said they will make it a priority, but now we really need an integrated federal strategy across the Executive branch. Mr. Congressman, we also need State and local governments to make sure they are also resourcing to the threat. (Exhibit DD-3)

444. The astounding level of financial support Defendant ADL actually received from the federal government removes all doubt as to its status as a quasi-governmental entity.

445. As previously noted, on or about December 20, 2022, Defendant ADL submitted a demand letter directly to the OMB for funds it desired to be redirected from programs and services that benefit the average American citizen to its own coffers. (Exhibits DD, DD-1)

446. Extraordinarily, that same demand letter brazenly commanded the OMB to allocate funds to other agencies and departments of the U.S. government.

84

447. Specifically, the demand letter, in the specious and spurious name of "combating antisemitism," commanded the OMB to allocate the following funds:

    a. $1,202,000,000.00 to itself,

    b. $288,400,000.00 to other existing agencies, and

    c. $27,500,000.00 for new initiatives. *Id.*

448. The total amount Defendant ADL secured from the government was $1,517,900,000.00.

449. Based upon the regulations of the U.S. government, Defendant ADL's fiscal appropriations demand made directly to the OMB incontrovertibly establishes it as a quasi-governmental entity.

450. In support of said statement, the U.S. government has rules and regulations governing the request of funds made directly to the OMB.

451. Specifically, according to the U.S. government's website, only "governmental agencies" can make requests of funds directly to the OMB.

452. With respect to the funding process, on USA.gov, the U.S. government states, in part, the following steps are to be followed in the standard and customary process for requesting and receiving funds through the OMB:

> The budget planning begins a year before the budget is to go into effect.
>
> 1. <u>Federal agencies</u> create budget requests and submit them to the White House Office of Management and Budget (OMB).
> 2. OMB refers to the agencies' requests as it develops the budget proposal for the president.
> 3. The president submits the budget proposal to Congress <u>early the next year</u>. (Emphasis added.)

453. Since only "federal agencies" can make funding requests directly through the OMB, and since Defendant ADL made a demand of $1.5 billion directly through the OMB, then Defendant ADL's actions subjected itself to the classification as quasi-governmental.

454. In an amazing display of power, the demand was approved in three days. (Exhibit DD-6)

455. That audacious demand by Defendant ADL establishes, on the most rudimentary level, that it not only had the nerve, but it had the capacity, capability, and confidence to direct the U.S. government on how it should spend the precious and dwindling financial resources of the American taxpayers for its own interests.

456. Candidly, exercising that much power and control over the U.S. government takes Defendant ADL well beyond the classification of "quasi-governmental," and, in actuality, makes it the proverbial "Pied Piper" that calls the tune that, apparently, the U.S. federal government must dance to…or else.

457. The declaration that Defendant ADL is quasi-governmental entity serves the purpose of:

   a. clarifying whether Defendant ADL has the capacity to infringe upon Minister Farrakhan and the Nation of Islam's First Amendment rights under the U.S. Constitution and under 42 U.S.C. §1983,

   b. finalizing said controversy regarding Defendant ADL's status as a quasi-governmental entity and its ability to act "under color of law,"

   c. establishing that this is not being done as a result of mere "procedural fencing,"

   d. affirming that this will not "increase friction between sovereign legal systems or improperly encroach upon the domain of a state or foreign court," and

   e. confirming there is no better or more effective remedy because the determination of Defendant ADL's status as a quasi-governmental entity is the only remedy available to address the constitutional controversy at issue.

   Wherefore, Minister Farrakhan respectfully requests that this Court, pursuant to 28 U.S.C. §2202, declare Defendant ADL to be a quasi-governmental entity of the U.S. government.

## REQUEST FOR RELIEF

WHEREFORE, Minister Farrakhan and the Nation of Islam respectfully request this Court enter the following judgment against Defendants ADL, Greenblatt, SWC, and Cooper :

A. Award damages, punitive and otherwise, in the amount of $4.8 billion resulting from the:

    i.   violation of Minister Farrakhan and the Nation of Islam's First Amendment rights pursuant to the U.S. Constitution and pursuant to 42 U.S.C. §1983, and

    ii.   malicious defamation of Minister Farrakhan and the Nation of Islam.

B. Declare that the false use of the term "anti-Semite," and all its variations and/or derivatives, constitute de facto defamation *per se*,

C. Declare that Defendant ADL is a quasi-governmental actor, and

D. Grant Minister Farrakhan and the Nation of Islam court costs, attorneys' fees, and any additional relief the Court finds appropriate.

Minister Farrakhan and the Nation of Islam demand a trial by jury.

Dated:  November 2, 2023                          Respectfully submitted,

By: /s/ *Abdul Arif Muhammad*              By: /s/ *Michael Muhammad*
Abdul Arif Muhammad, Esq.                 Michael K. Muhammad, Esq.
Pennsylvania Bar #47898                    Texas Bar #00787157
7351 South Stony Island Avenue           1700 Pacific Avenue, Suite 3740
Chicago, Illinois 60649                      Dallas, Texas 75201
(215) 313-0738) (Phone)                    (214) 432-6285 (Phone)
abdularifmuhammad@gmail.com         Michael@muhammadlawfirm.com

By: /s/ *Sa'ad Alim Muhammad*            All Pro Hac Vice Applications Were Granted
Sa'ad Alim Muhammad, Esq
Illinois Bar #6244757
1525 E. 53rd Street, Suite 447
Chicago, Illinois 60615
(312) 263-5989 (Phone)
SAM@PowerandDixon.com

ATTORNEYS FOR MINISTER LOUIS FARRAKHAN AND THE NATION OF ISLAM