# Exhibit DD



**Board of Directors**
*Chair*
Ben Sax

*CEO & National Director*
Jonathan A. Greenblatt

*Officers*
Nicole Mutchnik, Vice Chair
Larry Scott, Vice Chair
Andy Adelson, Treasurer
Yasmin Green, Secretary

Geraldine Acuña-Sunshine
Barry Curtiss-Lusher
Esta Gordon Epstein
Yadin Kaufmann
Alan Lazowski
Donna Levin
Glen S. Lewy
Daniel Lubetzky
Liz Price
Milton S. (Tony) Schneider
Shamina Singh
Robert Stavis
Christopher Wolf

**Leadership**
*Global Leadership Council*
Stacie Hartman, Co-Chair
Jane Saginaw, Co-Chair
*National Commission*
Steven Fineman, Co-Chair
Deb Shalom, Co-Chair

*Executive Team*
*Deputy National Director*
Kenneth Jacobson
*Senior Vice Presidents*
*Chief Growth Officer*
Frederic L. Bloch
*Democracy Initiatives*
Eileen Hershenov
*Finance & Administration*
Greg Libertiny
*International Affairs*
Sharon Nazarian
*Chief Impact Officer*
Adam Neufeld
*Talent & Knowledge*
Tom Ruderman
*Operations*
Gabrielle Savage
*National Affairs*
George Selim
*Chief of Staff & Chief Legal Officer*
Steven C. Sheinberg

**Past National Chairs**
Barbara B. Balser
Howard P. Berkowitz
Barry Curtiss-Lusher
Esta Gordon Epstein
Burton S. Levinson
Glen S. Lewy
Marvin D. Nathan
David H. Strassler
Robert G. Sugarman
Glen A. Tobias

**ADL Foundation**
Michael Sheetz, President

December 20, 2022

Shalanda Young
Director
Office of Management and Budget
Washington, D.C. 20500

Dear Director Young:

Since 1913, the mission of ADL has been to "stop the defamation of the Jewish people and to secure justice and fair treatment to all." Today, ADL is a global leader in exposing extremism, delivering anti-bias education, and monitoring and fighting the spread of hate in our communities and online. For decades, one of the most important ways in which ADL has fought against bigotry and antisemitism has been by investigating extremist threats across the ideological spectrum, including white supremacists and other far-right violent extremists, producing research to inform the public of the scope of the threat, and working with law enforcement, educators, the tech industry, and elected leaders to promote best practices that can effectively address and counter these threats.

We write to request your support in appropriating sufficient funds to help combat domestic extremism, fight antisemitism at home and abroad, prevent and address hate online and off, ensure the right to vote, and build a more just and inclusive society. Below, please find ADL's appropriations request to prioritize the following FY 2024 programs:

## HOMELAND SECURITY
1. HOMELAND SECURITY GRANT PROGRAM
2. CENTER FOR PREVENTION PROGRAMMING AND PARTNERSHIPS
3. NONPROFIT SECURITY GRANT PROGRAM
4. ONLINE RESOURCE TO PREVENT TARGETED VIOLENCE
5. ONLINE EXTREMISM INNOVATION AND RESEARCH

## COMMERCE, JUSTICE, AND SCIENCE
1. COUNTERING DOMESTIC TERRORISM
2. EXTREMISM IN LAW ENFORCEMENT
3. DOMESTIC VIOLENT EXTREMISM RESEARCH
4. IMPROVING HATE CRIMES REPORTING
5. EDUCATION, TRAINING, AND TECHNICAL SUPPORT FUNDING TO EFFECTIVELY PREVENT AND RESPOND TO HATE CRIMES
6. ADDRESSING HATE ONLINE

7. ONLINE HATE, HARASSMENT, AND EXTREMISM RESEARCH
8. INCREASING TRANSPARENCY & ACCOUNTABILITY FOR SOCIAL MEDIA
9. COMMUNITY RELATIONS SERVICE
10. VOTING SECTION'S ANTI-DISCRIMINATION WORK
11. UNITED AGAINST HATE INITIATIVE
12. ONLINE LITERACY PROGRAMS

**DEFENSE**
1. EXTREMISTS IN THE MILITARY

**STATE, FOREIGN OPERATIONS, AND RELATED PROGRAMS**
1. COUNTERING GLOBAL WHITE SUPREMACIST EXTREMISM
2. OFFICES OF THE SPECIAL ENVOY TO MONITOR AND COMBAT ANTI-SEMITISM AND SPECIAL ENVOY FOR HOLOCAUST ISSUES
3. INTERNATIONAL CENTER FOR RESEARCH ON THE INFORMATION ENVIRONMENT
4. SUPPORTING ISRAEL'S NORMALIZATION EFFORTS

**INTERIOR, ENVIRONMENT AND RELATED AGENCIES**

1. NEVER AGAIN EDUCATION ACT
2. NATIONAL ENDOWMENT FOR HUMANITIES AND NATIONAL ENDOWMENT FOR THE ARTS

**FINANCIAL SERVICES AND GENERAL GOVERNMENT**

1. INVESTIGATING THE FINANCING OF DOMESTIC EXTREMISM
2. ANTISEMITISM EDUCATION AND TRAINING FOR GOVERNMENT EMPLOYEES

**LABOR, HEALTH AND HUMAN SERVICES, EDUCATION, AND RELATED AGENCIES**

1. SUPPORT EDUCATIONAL INSTITUTIONS IN RESPONDING TO AND RECOVERING FROM HATE
2. UNITED WE SERVE
3. ONLINE LITERACY RESEARCH
4. COMBAT ANTISEMITISM ON COLLEGE AND UNIVERSITY CAMPUSES

**HOMELAND SECURITY**

1. HOMELAND SECURITY GRANT PROGRAM

In the aftermath of the January 6th insurrection, ADL created the PROTECT Plan – a comprehensive, bipartisan approach to mitigate the threat of domestic terrorism while protecting civil rights and liberties. As part of the PROTECT plan, ADL recommends measures to ensure Congress resources to the threats. Homeland Security Secretary Mayorkas made fighting domestic violent extremism a "National Priority Area." In FY 2021, for the first time, DHS declared Domestic Violent Extremism a National Priority Area, allowing states and local governments applying for the State Homeland Security Program (SHSP) and Urban Area Security Initiative (UASI) grant programs to avail themselves of a $77 million grant funding set aside to address related threats, 7.5 percent of the total awards. These resources are critical for states to create efforts to address the domestic violent extremist threat, a threat that is not a one-year threat, but ongoing and constantly evolving, and will require continuous funds. **ADL asks that the Homeland Security Grant program be sufficiently funded in FY 2024, that no less than $77 million be set aside for combating domestic violent extremism, including threats stemming from misogynist extremists on and offline.**

2. CENTER FOR PREVENTION PROGRAMS AND PARTNERSHIPS

As part of the PROTECT plan, ADL recommends that Congress increase prevention measures to address violent extremist radicalization and recruitment. The Center for Prevention Programming and Partnerships (CP3) funds grants for community initiatives oriented around resilience that can prevent extremist conspiracies from taking hold in our communities and off-ramp individuals before they choose violence. It is the only federal grant program dedicated to enhancing prevention capabilities in local communities. But this community resilience approach to preventing terrorism has been chronically under-funded. These grants are integral for better understanding the extremist landscape and developing responsible, innovative prevention efforts to combat emerging and complex threats from extremists offline and online—social media platforms and online multiplayer games alike—including from white supremacists, antisemites, and misogynists.

In 2016, the Homeland Security Advisory Council recommended funding the predecessor of CP3 at $100 million per year, prior to the current spike in domestic terrorism that led the intelligence and law enforcement community to refer to domestic terrorism as the most significant terrorist threat in our homeland. And peacebuilding experts studying violence trends in the United States have suggested that CP3 be funded at $200 million. **ADL requests $200 million for the Center for Prevention Programs and Partnerships grant program in FY 2024 to develop programs that would help mitigate against the complicated and evolving threat environment, in addition to robust program evaluation funds to ensure funded programs are adequately evaluated.**

At the same time, CP3 requires reform. Further funding should be allocated toward increasing transparency, improving program evaluation, and developing an approach that focuses on increasing funding to civil society and other nongovernmental organizations. A law enforcement-only approach centered on investigations and prosecutions is insufficient to address the challenge of radicalization leading to violence; therefore, buttressing funding to nongovernmental partners would promote the more effective multidisciplinary approach that the CP3 has adopted. Enhanced transparency promoting evidence-based solutions learned from the current grant program will

3

further lower the barriers to entry for civil and non-governmental groups in conjunction with steering them to promising practices ready for replication.

**ADL requests that the Administration address the need for transparency, oversight, community engagement, and measures of effectiveness for CP3. In accomplishing this and scaling the program, ADL recommends the Department of Homeland Security study whether some grants should be administered by other departments, such as the Department of Health and Human Services or the Department of Education, and potentially whether grants should be consolidated into a small number of larger grantees to provide sub-grants to local projects while distancing the program from security officials.**

   3. NON-PROFIT SECURITY GRANT PROGRAM

For the past decade, funding assistance from federal, state, and local governments has provided crucial support for security hardening and enhancements for our nation's non-profit institutions, including religious institutions. This responds to the continuing targeting by violent extremists of synagogues, mosques, churches, temples and other houses of worship and religious gathering places – a threat that was once again brought into stark relief by the horrific hostage-taking at Congregation Beth Israel synagogue in Colleyville, Texas on January 15, 2022.

The Non-Profit Security Grant Program (NSGP) provides non-profits with the capacity to increase their defense against these threats, including physical security and cybersecurity capacity and coordination. In FY 2022, Congress appropriated $250 million for the NSGP – a notable increase from the FY 2021 level. The President's FY 2023 budget request includes $360 million for this program and both the House and Senate FY 2024 bills include an appropriation at this level.

Unfortunately, despite these generous increases in the NSGP program, as extremism threats continue to rise, the need continues to be greater than the resources provided, as outlined in the President's budget request. For the FY 2022 grants, nearly $450 million in grant applications were received for this program. At a time of increased vulnerability to threats of hate-motivated violence by domestic extremists, the Administration should significantly increase funding for non-profit religious institutions and other non-profit organizations that government and law enforcement authorities objectively determine are at high risk of attack. In assessing the risk, officials should consider objective factors such as prior attacks against similarly situated institutions or organizations, and the vulnerability and financial needs of the specific institution. Officials should also consider how and what criteria for "terroristic threats" is and should be included by NGOs when they are assessing such threats for their applications. For example, the current inclusions are relatively narrow and could potentially leave out some nuanced, yet pervasive, extremist threats that are strongly influenced by white supremacy, antisemitism, or misogyny. And finally, these programs should seek to promote equity by expanding the reach of the grant to more communities affected by security threats and experiencing other vulnerabilities.

**ADL requests increased funding of the Non-Profit Security Grant Program at $500 million.**

**ADL requests $25 million for FEMA operations and support for the Non-Profit Security Grant Program to stay in line with the administrative needs of the expanded programs.**

4. ONLINE RESOURCE TO PREVENT TARGETED VIOLENCE

As part of the PROTECT plan, ADL recommends that Congress make resource investments that adapt to the threat from domestic extremists, which is severe – and growing. The majority of violence committed against Americans by extremists is now homegrown, and we must reorient our counterterrorism capabilities.

**ADL requests that resources be provided to support the requests outlined for the United We Stand Summit, including the launch of an online resource finder for federal content to prevent targeted violence in support of the [2021 National Strategy for Countering Domestic Terrorism](). This website will serve as a resource center for diverse institutional, governmental, and organizational users who require access to federal grants, program guidance, information sharing platforms, research, training, and community support efforts related to preventing targeted violence, including hate-based targeted violence.**

5. SCIENCE AND TECHNOLOGY EXTREMISM RESEARCH

In 2021, ADL announced its [REPAIR plan]() to push hate, harassment, and extremism back to the fringes of the digital world. Like ADL's PROTECT plan, parts of the REPAIR strategy can be pursued via Homeland Security appropriations, including funding to support much-needed research to better understand and responsibly mitigate online extremism and innovative approaches to address it.

Unfortunately, online hate, harassment, and extremism have become all too commonplace online. To help understand and in turn mitigate these threats, the Department of Homeland Security's Office of Science and Technology (S&T) funds innovative startup technology to advance the terrorism prevention market, a portion of which could be directed specifically to online extremism and/or the misogyny-extremism nexus. S&T also funds research of this nature. Despite steps from the White House to recognize and counter this threat, including the establishment of and encouraging work by the Task Force to Address Online Harassment and Abuse, there remains a need for empirical research about how the spread of extremist content and extremist activities online, especially that which is white supremacist, antisemitic, or misogynistic, impacts on the ground violence or crime.

Further, ADL was disturbed [to see reports]() of DHS blocking research on domestic extremism. This research is critical to understanding the threat and how to address it.

**ADL requests an additional $25 million in funding for these Office of Science and Technology programs and S&T research on related topics, specifically directed toward addressing domestic violent extremism.**

**ADL requests that OMB work with DHS to release existing research funding and consider ways to expand funding resources for domestic extremism researchers.**

5

# COMMERCE, JUSTICE, AND SCIENCE

1. COUNTERING DOMESTIC TERRORISM

As part of the PROTECT plan, ADL recommends that Congress make resource investments that adapt to the threat from domestic extremists, which is severe – and growing. The majority of violence committed against Americans by extremists is now homegrown, and we must reorient our counterterrorism capabilities.

Had it passed, the Domestic Terrorism Prevention Act (DTPA) would have ensured resources were used based on the threat of a terrorist movement. In light of the DTPA's failure to progress to passage, the Administration should work to ensure that transparency, oversight, personnel for domestic terrorism offices, and training opportunities for state and local partners are funded as if the bill had passed.

In a promising development, on January 11, 2022, the Department of Justice announced the creation of a new Domestic Terrorism Unit within the National Security Division to "focus on the domestic terrorism threat, helping to ensure that these cases are properly handled and effectively coordinated across DOJ and around the country." ADL applauds this new initiative, though notes that DOJ did not request funding specifically for the offices, and therefore ADL encourages the Department to ensure that it has appropriate budget and staffing to be successful, while ensuring robust protections for civil liberties.

**ADL supported the President's FY23 budget request of an additional $33 million for the FBI to increase capacity to conduct domestic terrorism investigations and urges the inclusion of this funding in the FY24 request. In addition, ADL requests OMB continue to enhance resources devoted to countering domestic terrorism.**

**ADL also requests that executive action reflect the need for transparency and threat-proportionate resource allocations.**

2. EXTREMISM IN LAW ENFORCEMENT

As part of the PROTECT plan, ADL urges Congress and the Administration to recognize and address the fact that some public safety officers are extremists, as evidenced by the participation of active law enforcement personnel in the insurrection of January 6, 2021. Additionally, FBI assessments dating back more than 15 years, among other sources, have noted that such extremists seek out positions in law enforcement and work to recruit law enforcement personnel into their ranks in order to gain access to sensitive security-related information as well as tactical knowledge and training. The consequences of this infiltration are potentially severe, ranging from deterioration of police-community relations to destruction, conflict, and death resulting from extremist officers' activities.

**ADL asks that OMB support improved security clearance policies, procedures, and trainings to ensure that individuals whose possible adherence to violent extremist ideologies raise questions about their judgment or trustworthiness do not have security clearances.**

6

**ADL requests that the Department of Justice provide the highest priority to Community Oriented Policing Services (COPS) program applicants and law enforcement agencies that request support for screening applicants and personnel for persistent racism and/or violent extremist ideologies or affiliations, and further to prioritize COPS grants to program applicants and law enforcement agencies that require their employees to complete training on extremism.**

3. DOMESTIC VIOLENT EXTREMISM RESEARCH

As part of the PROTECT plan, ADL recommends increased investment in federal research to study ways to close the gap in our ability to prevent domestic extremism that will otherwise endure as an increasingly dangerous and destabilizing force in American communities. As domestic violent extremism is on the rise – and already at an impactful level – we must expand the government's knowledge, and that of the general public, on the threat and best practices to counter it. Data should drive policy. The National Institute of Justice (NIJ) performs essential research on violent extremist radicalization and best practices and methods to counter it, the Bureau of Justice Statistics is in a position to collect and analyze data to better understand the context around the issues, and the Office of Justice Programs is well-suited to coordinate various complementary efforts throughout the offices it oversees. In FY 2022, Congress included no less than $6 million to be directed to NIJ for domestic radicalization research. While this is a good step, this funding still falls far short of what is needed for comprehensive research into these complex threats from extremists offline and online—social media platforms and online multiplayer games alike—including from white supremacists, antisemites, and misogynists.

Further, FY 2022 appropriations provided NIJ with $500,000 in funds specifically to support a feasibility study of the potential for an independent clearinghouse for online extremist content. NIJ has not publicized the status of this research.

**ADL requests $20 million above current levels – approximately $26 million total – to the Office of Justice Programs, dedicated specifically to research and data related to domestic violent extremism issues.**

4. IMPROVING HATE CRIMES REPORTING

Fighting hate crime is a critical task, especially now that antisemitism, anti-Asian American violence, and other forms of racism and bigotry are at all-time high levels. We are alarmed that the Federal Bureau of Investigation (FBI) hate crime statistics for 2021 convey the lowest participation from cities and states in two decades. At a time when communities across the country are feeling increasingly vulnerable to bias-motivated crimes and extremist-fueled attacks, critical funding at the highest level is required to combat hate-motivated violence as you work to craft the FY2024 budget to prioritize addressing bias-based crimes and resolving the alarming gaps in data collection and reporting.

Even with huge swaths of data from some of the largest jurisdictions in the country missing, the 2021 report was extremely alarming. A total of 7,262 hate crime incidents were reported across the country in 2021, the third-highest number in a decade. The ADL's 2021 report found a significant increase in right-wing extremist related terrorist plots/attacks and distribution of white supremist propaganda.

One of the biggest impediments to developing a complete picture of the scope and nature of hate crimes in this country – and therefore having the ability to design and implement a fulsome response – is the lack of comprehensive and reliable data. This is not a new problem – the FBI has struggled to collect and compile accurate data on hate crimes since the enactment of the Hate Crime Statistics Act in 1990. There are concerning signs that the problem may be getting worse. According to data from the FBI, there has been a consistent decline in the number of law enforcement agencies participating in the federal hate crime reporting program since 2018. Furthermore, even among agencies that are in theory participating in the program, far too many report zero hate crimes, raising concerns about the accuracy of the numbers. In 2020, 10 cities with a population over 100,000 did not report any data and 59 cities with a population over 100,000 reported zero hate crimes.

To resolve the huge swaths of missing data from some of the largest jurisdictions in the country, critical attention and funding is required. The Jabara-Heyer NO HATE Act, enacted in 2021 as part of the COVID-19 Hate Crimes Act, contains key provisions to help improve hate crime data collection and reporting, including authorizing grants to promote hate crime training, prevention, best practices, and data collection initiatives; assistance to law enforcement agencies in implementing the National Incident-Based Reporting System (NIBRS) crime data reporting system; and grants to develop state hate crime reporting hotlines to refer individuals to local law enforcement and support services. Congress appropriated $5 million in FY 2022 to implement the grants created by this legislation. For FY23, the House bill includes $15 million for these grants and the Senate bill appropriates $10 million for this purpose.

**ADL requests that the Administration fully fund the grant programs authorized by the COVID-19 Hate Crimes Act at no less than $20 million to support state and local efforts to implement the National Incident-Based Reporting System, create hate crime reporting hotlines, and train officers and develop protocols for identifying, investigating, and reporting hate crimes.**

**ADL urges the Administration to ensure the FBI conducts outreach and provides technical assistance to law enforcement agencies that have not consistently reported hate crimes data, with particular attention to small agencies with the fewest resources for administrative management and data analysis. In addition, the Department should continue to ask State, local, and tribal law enforcement agencies to include the cost of participation in the FBI's HCSA program for the purposes of calculating extraordinary expenses associated with the investigation and prosecution of hate crimes under Public Law 111– 84, section 4704(b)(3).**

5. EDUCATION, TRAINING, AND TECHNICAL SUPPORT FUNDING TO EFFECTIVELY PREVENT AND RESPOND TO HATE CRIMES

Since the enactment of the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act in 2009, the federal government has provided crucial support to state and local efforts to raise community awareness about hate crimes, provide robust and culturally-appropriate training for law enforcement, and ensure appropriate investigations and prosecutions of hate crimes. During this time of historically high rates of hate crimes – particularly those targeting the AAPI community – this support remains vital to local efforts to effectively prevent and respond to bias and hate motivated attacks. This program was funded at $13 million in FY 2022.

8

**ADL requests $100 million for grants to State, local, and tribal law enforcement agencies to conduct educational outreach and training on hate crimes and to investigate and prosecute hate crimes, as authorized by section 4704 of the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act (Public Law 111–84).**

**ADL also requests $30 million for grants to support community-based approaches to preventing hate crimes through conflict resolution and community empowerment and education, which was included in the FY 2023 House appropriations bill. While Congress ultimately appropriated $5 million of this funding in FY 2022, that amount falls far short of the need.**

**ADL supports the President's FY 2023 budget request for an additional $5.8 million for the Civil Rights Division to increase capacity to enforce civil rights statutes and address hate and bias in in the areas of education, employment, housing, policing, public accommodations, and access to federally funded programs and urges the inclusion of this funding in the FY 2024 request.**

6. ADDRESSING HATE ONLINE

One urgent aspect of hate crimes is the proliferation of hate and harassment online. ADL's Center for Technology and Society (CTS) conducts an annual survey to assess bias-motivated online harassment and, in 2022, found disturbing results. Overall, the survey revealed that 2 in 5 Americans (40 percent) experienced some type of online harassment in the course of their lives, with 1 in 10 (12 percent) having experienced severe types of harassment—defined as including physical threats, sustained harassment, stalking, sexual harassment, doxing, and/or swatting—in the past 12 months. Data from the same survey also shows that marginalized or minoritized identity groups—including Jews, women, people of color, and LGBTQ+ people—experience hate-based online harassment (i.e., targeted attacks or abuse of marginalized people because of their race, ethnicity, religion, gender, sexuality, physical appearance, identity, or disability) at disproportionately high levels. According to the study, 65 percent of people from these groups who experienced online harassment reported being targeted for an aspect of their identity, compared to 38 percent of people from non-marginalized groups. Moreover, in addition to severe harassment for historically marginalized groups being higher, these groups also experienced higher rates of online stalking (12 percent vs. 6 percent) and sexual harassment (12 percent vs. 5 percent).

In addition, the study revealed identity-specific differences in the incidences of harassment, its growth trend, and the type of abuse endured. In particular:

- LGBTQ+ people are more likely than any other marginalized group to experience online harassment. Specifically, 66 percent of LGBTQ+ users surveyed experienced harassment compared to 38 percent of non-LGBTQ+ users with 1 in 2 (53 percent) attributing the targeting to their sexual orientation.
- Asian Americans reported the most significant increase in online harassment in the last two years (from 11 percent in 2020 to 39 percent in 2022), tracking closely with the rise in anti-Asian incidents offline. Further, 62 percent attributed the harassment to their physical appearance and 53 percent to their race or ethnicity, compared to 34 percent and 23 percent of non-Asian Americans.

9

- Women were more than twice as likely to report ever experiencing sexual harassment online as men were (14 percent vs. 5 percent), with 2 in 5 attributing the harassment to their gender (vs. 1 in 7 of men). The intersectionality matrix also seems to be at play, with 81 percent of non-white women attributing being harassed to aspects of their identity (vs. 61 percent of white women).
- Although Jewish respondents experienced online harassment at similar rates as non-Jews, they were more likely to attribute harassment to their religion (37 percent vs. 14 percent).

For the first time, ADL surveyed youth aged 13-17 about their experiences of hate and harassment online and found that nearly half (47 percent) reported experiencing harassment and a quarter experienced severe harassment including physical threats, sustained harassment, stalking, sexual harassment, doxing, and swatting. The survey also underscored how youth–especially marginalized–are at particular risk of experiencing online harassment across all platforms. Nearly half of respondents (47 percent) ages 13-17 experienced online harassment at some point in their lives, with one-fourth (25 percent) experiencing severe harassment.

An overwhelming majority of respondents of the survey who experienced harassment said that the abuse happened on Facebook (68 percent), with Instagram (26 percent), Twitter (23 percent), and YouTube (20 percent) following far behind. Similar trends were also observed in the last 12 months. Notably, Facebook's primacy holds even when accounting for the proportion of platform users compared to the proportion of those who reported harassment on the platform.

CTS also conducts an [annual survey](#) to assess hate and harassment in online multiplayer games. For the third consecutive year, ADL's survey found that harassment experienced by adult gamers increased and remains at alarmingly high levels, while the new research on the experience of teens also raises significant concerns. In 2021, 83 percent of adults ages 18-45 experienced harassment in online multiplayer games—representing over 80 million adult gamers. Alarmingly, 71 percent of adult online multiplayer gamers experienced severe abuse, including physical threats, stalking, and sustained harassment. 60 percent of young people ages 13-17 experienced harassment in online multiplayer games—representing nearly 14 million young gamers. The survey found that the largest increase in identity-based harassment occurred among adult respondents who identified as women (49 percent in 2021, compared to 41 percent in 2020), Black or African American (42 percent in 2021, compared to 31 percent in 2020), and Asian American (38 percent in 2021, compared to 26 percent in 2020). It is worth noting that although there was no statistically significant change in identity-based harassment of adult LGBTQ+ players (38 percent in 2021 versus 37 percent in 2020), the number is still of concern.

Despite evidence from civil society about the increasing problem of hate online, the [FBI's efforts](#) to collect data on these crimes has fallen short. There is very little data available through the data collected pursuant to the Hate Crime Statistics Act about hate crimes facilitated by the internet to allow policymakers, technology companies, and impacted communities to develop effective policy solutions to address them.

The Violence Against Women Act Reauthorization Act of 2022, enacted as part of the Consolidated Appropriations Act of 2022, authorized two new federal grant programs to improve the response to cybercrimes against individuals, including hate and bias-motivated offenses. The first authorizes a grant program to provide funding to states, Indian Tribes, and units of local government for the prevention, enforcement, and prosecution of cybercrimes against individuals. The second authorizes

10

a grant program to establish and maintain a National Resource Center on Cybercrimes Against Individuals, which would "provide resource information, training, and technical assistance to improve the capacity of individuals, organizations, governmental entities, and communities to prevent, enforce, and prosecute cybercrimes against individuals."

**ADL requests that both grant programs receive funding. First, ADL requests the grant program provide funding for the prevention, enforcement, and prosecution of cybercrimes against individuals be fully funded at the authorized level of $10 million. Second, ADL requests that $4 million be provided to establish the National Resource Center on Cybercrimes Against Individuals.**

   7.  ONLINE HATE, HARASSMENT, AND EXTREMISM RESEARCH

In 2021, ADL announced its REPAIR plan to push hate, harassment, and extremism back to the fringes of the digital world. Like ADL's PROTECT plan, parts of the REPAIR strategy can be pursued via federal funding, including funding to support much-needed research to better understand and responsibly mitigate online hate and extremism.

*Tools and Services to Protect Against and Respond to Online Hate:* For example, users, especially those who have been or are likely to be targeted by online hate, harassment, or extremism, rely on private technology companies to provide them with tools and services to defend themselves from online hate and harassment. However, there is insufficient data to understand whether such services are effective. Research is needed that evaluates platforms' available tools and assesses users' needs, including a gap analysis of available tools and services.

*Product Design:* Additionally, in addressing hate, harassment, and extremism on digital social platforms, much of the emphasis has been on the role of platform policy. While this is necessary, it is not sufficient. Government actors do not have a solid understanding of the role product design plays in exacerbating and normalizing hate, harassment, and extremism online. Government agencies should support research into how product design and implementation amplify and encourage the spread of hate, harassment, and extremism. The federal government should also commission a third-party audit of product systems related to product design as a means to hold technology companies accountable in terms of whether they are implementing anti-hate by design to address online abuse.

*Surveillance Advertising:* Tech companies' fundamental business model—surveillance advertising—maximizes profits because the astronomical amount of data collected on every user enables platforms to target them with the content and recommendations best designed to keep those users engaged on the platform for as long as possible in order to serve them with as many ads as possible. To do that, social media companies constantly track users' online behavior (on and off an individual platform), collect their data, and feed it to algorithms that are optimized to recommend engaging content that will make them click, like, comment on, and share. The longer users spend online and the more engaged they are, the more data social media companies can collect to predict what content will engage those users even more. Then, social media companies serve that content to those users, and sweep up even more data in order to recommend more and better-targeted ads to those same users. This is a self-perpetuating loop. Increasing engagement on social media platforms for the purpose of making more and more ad revenue, no matter the societal cost, is the overarching goal toward which platform function is designed. It remains the most important metric of success

for these companies. Whether the platforms intentionally designed their algorithms to inflame hateful content is not the point. Once the goal of maximizing engagement above all else is decided upon and coded into the algorithm, and is not materially changed or stopped, then the consequences described here are inevitable. Without interventions from a number of sources, including adoption of the rule at issue here, these consequences will only get worse. It is important that the federal government contribute to the growing body of research regarding this practice to better understand and appropriately mitigate this harmful practice. Continued research on this issue is needed from both outside experts and government bodies to understand the harms associated with targeted advertising to support and influence legislative, regulatory, and policy solutions.

*Algorithmic Discrimination & Harms:* The federal government should invest in research to better understand how algorithmic processes discriminate on the basis of protected characteristics. There should also be research into and development of best practices to mitigate systemic risks from algorithmic amplification of problematic content, including the dissemination of illegal content or goods as well as the facilitation of illegal activity, negative effects on rights established by the U.S. Constitution, discrimination based on a protected class, any malfunctioning or intentional manipulation of platform services, including the amplification of illegal content, content in breach of community standards or any other content with an actual or foreseeable negative effect on the protection of public health, minors, civic discourse, electoral processes and public security.

*Online Harassment:* Over the past year, ADL was alarmed by antisemitic attempts to pinpoint and disrupt local Jewish networks. In one case, a designated terrorist organization and state-sponsored news agency even endorsed such efforts. This activity understandably reignited concerns about doxing, a type of online harassment in which someone broadcasts private or identifying information about an individual, group or organization online to incite harassment.

ADL research has shown that acts of online harassment and digital abuse, like doxing, disproportionately impact vulnerable communities. For example, ADL's 2022 Online Hate and Harassment survey revealed that marginalized communities, especially the LGBTQ+ community, experience doxing at over twice the average national rate. It also found that nearly a quarter of Jewish respondents experienced severe harassment online which includes doxing. In the same survey, 89 percent of respondents favored enacting laws to prevent doxing.

ADL supports additional research, analysis, and awareness of how cyber harassment, including doxing, is used by nefarious actors such as terrorists and foreign malicious actors. ADL supports steps like these taken with the intent to educate and protect vulnerable communities that are disproportionately at risk of such attacks. **ADL supports designating $20 million for research to inform federal policy to combat online hate, harassment, and extremism.**

8. INCREASING TRANSPARENCY & ACCOUNTABILITY FOR SOCIAL MEDIA

In an effort to stop the spread of hateful, racist, and extremist online activity and content, as well as stymie the flow of disinformation, it is vital that the public and policymakers alike have a better understanding of how social media platforms are protecting their users. Current transparency reports on how social media companies are policing their platforms are often inconsistent and confusing, misleading consumers and investors alike. That is why the federal government must champion policies that promote transparency and accountability.

12

ADL surveys have underscored public support for policies that promote accountability and transparency in online social spaces including social media platforms and online multiplayer games. For instance, recent ADL surveys have found that more than 3 out of 4 respondents think that online platforms should be doing more to counter hate online and that laws need to be strengthened to hold platforms accountable for online hate and harassment (78 percent and 77 percent respectively). They also found that more than half (59 percent) of adult gamers believe that laws need to be created to increase transparency around how game companies address hate, harassment, and extremism.

The federal government should invest resources in and build off of current initiatives to enhance transparency and accountability of social media platforms for the harms that they facilitate. For instance, studies, commissions, or other measures can be funded in order to develop comprehensive transparency framework for platforms on content moderation, recommender systems, digital ads, high-reach content, internal research, and other information identified like that described in H.R. 6796, *the Digital Services and Oversight Safety Act.*

**ADL supports designating robust funds to develop transparency frameworks in an effort to combat online harms. ADL requests up to $10 million for the federal government to enhance current initiatives to promote transparency and accountability of social media platforms. The objective of such investment should be to develop a comprehensive transparency framework for platforms on content moderation, recommender systems, digital ads, high-reach content, internal research, and other information.**

9. COMMUNITY RELATIONS SERVICE

The Department of Justice's Community Relations Service (CRS) saves lives and preserves community cohesion and must be taken to scale to meet increased demand resulting from COVID-19-related hate crimes targeting the Asian-American Pacific Islander community, and other increases in discrimination and hate.

CRS provides facilitation, mediation, training, and consultation services that improve communities' abilities to problem solve and build capacity to prevent and respond to conflict, tension, and hate crimes based on race, color, national origin, gender, gender identity, sexual orientation, religion, and disability.

CRS's efforts are both symbolically important and practically effective. For example, after a gunman killed a worshipper and wounded three others at the Chabad of Poway, CA, on April 27, 2019 – exactly six months after the shooting at the Tree of Life Synagogue in Pittsburgh – members of the surrounding community asked CRS to help reestablish community safety and rebuild residents' confidence that they could safely attend religious services. Within days of the shooting, CRS brought the local U.S. Attorney's Office together with leaders of local faith communities to assess tensions, identify concerns, and share best practices for addressing hate crimes and protecting religious institutions. CRS served as a liaison between community stakeholders and the state and federal agencies involved in investigating the shooting. CRS also worked with stakeholders to convene continuing conversations, including a Bias Incidents and Hate Crimes forum held by an interfaith coalition of San Diego-area religious communities, and an August 2019 training that

brought the U.S. Attorney's Office back together with faith community leaders to build capacity to prevent and respond to hate crimes. In FY 2022, Congress appropriated $21 million and the President's FY 2023 budget request included $25 million for CRS.

**ADL supports increased funding for the Community Relations Service at $40 million to ensure availability of crucial services to more communities in need.**

## 10. CIVIL RIGHTS DIVISION'S VOTING SECTION

Before, during, and after the 2020 Presidential Election, disinformation about threats to election security and integrity spread widely, and in significant part due to some political figures' repeated public critiques of normal procedures such as mail voting and of extraordinary measures undertaken to avoid COVID-19-related perils, including proactive mailing of mail ballot applications and expansion of early voting hours and periods. Election administrators, federal and international experts at agencies like the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency, and independent audits of paper records of votes cast have all affirmed that election results were valid, and no significant or widespread fraud or irregularities occurred. Nonetheless, according to the [Brennan Center for Justice](#), since the beginning of 2021, 21 states have passed at least 42 restrictive voting laws. These measures take direct aim at aspects of the voting process that disproportionately affect voters of color. Preserving equal access to elections in 2022 and beyond will depend upon the strength and readiness of the most capable and expert voting rights prosecutor in the nation, the Civil Rights Division's Voting Section.

The Voting Section requires expanded capacity to respond to the many states and localities that already have adopted discriminatory voting restrictions or are poised to do so. For example, Georgia enacted a law expanding voter identification requirements, which BIPOC voters are disproportionately likely to be unable to meet and to perceive as a barrier to voting; the bill also makes it a crime to approach voters waiting in line to give them food or water and restricts the use of ballot drop boxes for mail voters. Another example is Iowa, which enacted a bill that shortens the state's early voting period and polling place hours and restricts the use of satellite voting sites, all flexibilities that have proven particularly important to the state's growing population of young Latino voters, according to LULAC Iowa Political Director Joe Henry.

In FY 2022, Congress directed the Department to "prioritize resources to enforce the civil provisions of Federal laws that protect the right to vote."

**ADL requests an additional $5 million for the Civil Rights Division for additional attorney positions in the Voting Section to conduct Voting Rights Act enforcement activities.**

**ADL also supports an additional $6 million for the Civil Rights Division to increase capacity for activities focused on reinforcing democratic institutions to bolster voting rights, educational opportunities, and ensure constitutional policing and urges inclusion of this funding in the FY 2024 request.**

## 11. UNITED AGAINST HATE INITIATIVE

The Department's United Against Hate initiative is vital to strengthening relationships between communities and law enforcement to build trust and encourage the reporting of hate crimes and hate incidents. ADL welcomes the recent expansion of this program and recognizes the importance of